**Davidoff Hutcher & Citron LLP**
605 Third Avenue, 34th Floor
New York, New York 10158
Telephone: (212) 557-7200
Facsimile: (212) 286-1884
Michael Wexelbaum
E-mail: mw@dhclegal.com
Larry Hutcher
E-mail: lkh@dhclegal.com
Michael Katz
E-mail: mdk@dhclegal.com

*Attorneys for Defendants Magnify Inc., Premero
Investments Ltd., Strand International Investments
Ltd., The Yeshaya Horowitz Association, Yair Green,
and Express Enterprises Inc.*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |

In re:

BERNARD L. MADOFF,

        Debtor.

| | |
|---|---|
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | |
| Plaintiff, | Adv. Pro. No. 10-05279 (SMB) |
| v. | |
| MAGNIFY INC., PREMERO INVESTMENTS LTD., STRAND INTERNATIONAL INVESTMENTS LTD., THE YESHAYA HOROWITZ ASSOCIATION, YAIR GREEN, and EXPRESS ENTERPRISES INC., | |
| Defendants. | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION
TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page No.**

TABLE OF AUTHORITIES ................................................................................ iii

PRELIMINARY STATEMENT .......................................................................... 1

RELIEF REQUESTED ....................................................................................... 4

GROUNDS FOR DISMISSAL .......................................................................... 5

STATEMENT OF FACTS .................................................................................. 6

ARGUMENT ...................................................................................................... 6

STANDARDS OF REVIEW GOVERNING MOTIONS TO DISMISS .................... 6

       POINT I ....................................................................................................... 11

       THE SECOND AMENDED COMPLAINT FAILS TO ADEQUATELY
       ALLEGE "ACTUAL KNOWLEDGE," THEREBY MANDATING
       THE DISMISSAL OF COUNTS TWO THROUGH EIGHT THEREOF ...................... 11

       POINT II ...................................................................................................... 43

       THE TRUSTEE'S INTENTIONAL TWO-YEAR FRAUDULENT
       TRANSFER CLAIM AGAINST PREMERO PURSUANT TO
       BANKRUPTCY CODE § 548(a)(1)(A) MUST BE DISMISSED;
       SAID CLAIM SEEKS TO RECOVER PRINCIPAL, RATHER
       THAN FICTITIOUS PROFITS, AND PREMERO HAS A VALID
       DEFENSE THERETO UNDER BANKRUPTCY CODE § 548(c) ............................... 43

       POINT III ..................................................................................................... 51

       THE TRUSTEE'S ALTER EGO/PIERCING THE CORPORATE
       VEIL ALLEGATIONS ARE DEVOID OF MERIT; AS A RESULT,
       THE FIRST COUNT MUST BE DISMISSED AS AGAINST GREEN ......................... 51

       A.     Pleading Standard for Alter Ego/Piercing the Corporate Veil Allegations .......... 51

       B.     Law Applicable to the Trustee's Alter Ego/Piercing the Corporate
              Veil Allegations ........................................................................................ 52

       C.     Standard for Determining Foreign Law .......................................................... 53

       D.     British Virgin Islands and Panama Law on Alter Ego/Piercing the
              Corporate Veil Allegations ......................................................................... 54

i

1.    British Virgin Islands Law ......................................................................... 54

2.    Panama Law .............................................................................................. 58

E.    The SAC's Alter Ego/Piercing the Corporate Veil Allegations are Inadequate ... 59

1.    Allegations With Respect to Strand ........................................................... 59

2.    Allegations With Respect to Magnify ........................................................ 62

POINT IV ....................................................................................................................... 66

THE CONCLUSORY ALLEGATION OF A PARTNERSHIP BETWEEN
ALBERT IGOIN AND YAIR GREEN HAS NO BASIS ................................................ 66

POINT V ......................................................................................................................... 68

ALL TRANSFERS PRIOR TO JANUARY 1, 2001 MUST BE DISMISSED ............... 68

POINT VI ........................................................................................................................ 69

THE TRUSTEE'S EQUITABLE SUBORDINATION CLAIM IS
DEFICIENT AND MUST BE DISMISSED .................................................................... 69

CONCLUSION ............................................................................................................... 70

ii

## TABLE OF AUTHORITIES

Page No.

**Cases**

*131 Main St. Assocs. v. Manko,*
    897 F.Supp. 1507 (S.D.N.Y. 1995) ................................................................ 10

*Apace Commc'ns, Ltd. v. Burke,*
    522 F.Supp.2d 509 (W.D.N.Y. 2007) ............................................................ 51

*Apex Mar. Co., Inc. v. OHM Enters., Inc.,*
    No. 10-cv-8119, 2011 WL 1226377 (S.D.N.Y. Mar. 31, 2011) ...................... 51

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) .................................................................................. 7, 8

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*
    493 F.3d 87 (2d Cir. 2007) ............................................................................ 7

*Balaber-Strauss v. Lawrence,*
    264 B.R. 303 (S.D.N.Y. 2001) ....................................................................... 9

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544, 127 S.Ct. 1955 (2007) ......................................................... 7, 8

*Bianco v. Erkins (In re Gaston & Snow),*
    243 F.3d 599 (2d Cir. 2001) ......................................................................... 52

*Brass v. Am. Film Techs., Inc.,*
    987 F.2d 142 (2d Cir. 1993) ......................................................................... 10

*Bristol-Myers Squibb Co. v. Matrix Labs. Ltd.,*
    655 F. App'x 9 (2d Cir. 2016) ..................................................................... 54

*Brodsky v. Stadlen,*
    138 A.D.2d 662, 526 N.Y.S.2d 478 (2d Dep't 1988) ..................................... 67

*Cantley v. Ducharme,*
    No. 09-cv-23424, 2011 WL 611623 (S.D. Fla. Feb. 15, 2011) ...................... 59

*Cardell Fin. Corp. v. Suchodolski Assocs., Inc.,*
    No. 09-cv-6148, 2012 WL 12932049 (S.D.N.Y. July 17, 2012) ..................... 65

*Care Envtl. Corp. v. M2 Techs., Inc.,*
    No. 05-cv-1600, 2006 WL 148913 (E.D.N.Y. Jan. 18, 2006) .................... 51, 64

iii

*Chambers v. Time Warner, Inc.*,
  282 F.3d 147 (2d Cir. 2002) ................................................................ 10

*Cortec Indus., Inc. v. Sum Holding L.P.*,
  949 F.2d 42 (2d Cir. 1991) ............................................................. 10, 11

*Czernicki v. Lawniczak*,
  74 A.D.3d 1121, 904 N.Y.S.2d 127 (2d Dep't 2010) ....................... 66, 67

*De Jesus v. Sears, Roebuck & Co.*,
  87 F.3d 65 (2d Cir. 1996) ................................................................... 7, 8

*Evercrete Corp. v. H-Cap Ltd.*,
  429 F.Supp.2d 612 (S.D.N.Y. 2006) ....................................................... 7

*First Nationwide Bank v. Gelt Funding Corp.*,
  27 F.3d 763 (2d Cir. 1994) .................................................................... 7

*Fletcher v. Atex, Inc.*,
  68 F.3d 1451 (2d Cir. 1995) ................................................................ 52

*FR 8 Singapore Pte. Ltd. v. Albacore Mar. Inc.*,
  794 F.Supp.2d 449 (S.D.N.Y. 2011) ............................................. passim

*Future Indus. of Am., Inc. v. Advanced UV Light GMBH*,
  No. 09-cv-00966, 2010 WL 7865077 (D. Conn. Sept. 1, 2010) ............. 53

*Gant v. Wallingford Bd. of Educ.*,
  69 F.3d 669 (2d Cir. 1995) ................................................................... 8

*Ginx, Inc. v. Soho Alliance*,
  720 F.Supp.2d 342 (S.D.N.Y. 2010) ..................................................... 11

*Goel v. Bunge, Ltd.*,
  820 F.3d 554 (2d Cir. 2016) ................................................................ 10

*Growblox Scis., Inc. v. GCM Admin. Servs., LLC*,
  No. 14-cv-2280, 2016 WL 1275050 (S.D.N.Y. Mar. 31, 2016) ......... 66, 67

*Highland Capital Mgmt. v. UBS Sec. LLC (In re Lyondell Chem. Co.)*,
  491 B.R. 41 (Bankr. S.D.N.Y. Apr. 10, 2013) .................................. 10, 11

*I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., Inc.*,
  936 F.2d 759 (2d Cir. 1991) ................................................................ 11

*In re Optimal U.S. Litig.*,
  No. 10-cv-4095, 2011 WL 4908745 (S.D.N.Y. Oct. 14, 2011) ....... 56, 57, 59, 60

iv

*In re Tyson*,
    433 B.R. 68 (S.D.N.Y. 2010)...……...…………………………………………… passim

*Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*,
    62 F.3d 69 (2d Cir. 1995)................................................................................. 10

*Int'l Equity Invs., Inc. v. Opportunity Equity Partners, Ltd.*,
    475 F.Supp.2d 456 (S.D.N.Y. 2007)................................................................. 54

*Jonas v. Estate of Leven*,
    116 F.Supp.3d 314 (S.D.N.Y. 2015)........................................................ passim

*Kids Cloz, Inc. v. Officially For Kids, Inc.*,
    320 F.Supp.2d 164 (S.D.N.Y. 2004)................................................................ 67

*Kolb v. ACRA Control, Ltd.*,
    21 F.Supp.3d 515 (D. Md. 2014)..................................................................... 54

*Krish v. Balasubramaniam*,
    No. 06-cv-01030, 2006 WL 2884794 (E.D. Cal. Oct. 10, 2006)..................... 54

*McKevitt v. Mueller*,
    689 F.Supp.2d 661 (S.D.N.Y. 2010)............................................................... 10

*N. Am. Knitting Mills, Inc. v. Int'l Women's Apparel, Inc.*,
    No. 99-cv-4643, 2000 WL 1290608 (S.D.N.Y. Sept. 12, 2000) .............. 66, 68

*P.A.C. Consolidators Ltd v. United Cargo Sys. Inc.*,
    No. 10-cv-1981, 2011 WL 3099887 (E.D.N.Y. July 25, 2011)...................... 51

*Panam Mgmt. Grp., Inc. v. Pena*,
    No. 08-cv-2258, 2011 WL 3423338 (E.D.N.Y. Aug. 4, 2011) ................ passim

*Pani v. Empire Blue Cross Blue Shield*,
    152 F.3d 67 (2d Cir. 1998)................................................................................ 9

*Papasan v. Allain*,
    478 U.S. 265 (1986).......................................................................................... 7

*Pappas v. Bank of Am. Corp.*,
    309 F. App'x 536 (2d Cir. 2009) ...................................................................... 8

*Pereira v. Grecogas Ltd. (In re Saba Enters., Inc.)*,
    421 B.R. 626 (Bankr. S.D.N.Y. 2009) ........................................................... 52

*Picard v. Avellino (In re BLMIS)*,
    557 B.R. 89 (Bankr. S.D.N.Y. 2016)...................................................... passim

590854v.5

*Picard v. Ceretti (In re BLMIS)*,
    Nos. 08-01789, 09-01161, 2015 WL 4734749 (Bankr. S.D.N.Y. Aug. 11, 2015).......... passim

*Picard v. Estate of Mendelow (In re BLMIS)*,
    560 B.R. 208 (Bankr. S.D.N.Y. 2016)............................................................... passim

*Picard v. Ida Fishman Revocable Trust (In re BLMIS)*,
    773 F.3d 411 (2d Cir. 2014)............................................................................ 12

*Picard v. Katz*,
    462 B.R. 447 (S.D.N.Y. 2011)......................................................................... passim

*Picard v. Legacy Capital Ltd. (In re Bernard L. Madoff Inv. Sec. LLC)*,
    548 B.R. 13 (Bankr. S.D.N.Y. 2016)................................................................ passim

*Picard v. Madoff (In re Bernard L. Madoff Inv. Sec. LLC)*,
    458 B.R. 87 (Bankr. S.D.N.Y. 2011)................................................................ 8

*Picard v. Merkin (In re BLMIS)*,
    515 B.R. 117 (Bankr. S.D.N.Y. 2014)............................................................. passim

*Picard v. Merkin (In re BLMIS)*,
    563 B.R. 737 (Bankr. S.D.N.Y. 2017)............................................................. passim

*Picard v. Shapiro (In re BLMIS)*,
    542 B.R. 100 (Bankr. S.D.N.Y. 2015)............................................................. passim

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*,
    453 F.Supp.2d 633 (S.D.N.Y. 2006)...................................................... 60, 61, 62

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
    516 B.R. 18 (S.D.N.Y. 2014)........................................................................... 44

*SIPC v. BLMIS (In re Madoff Sec.)*,
    476 B.R. 715 (S.D.N.Y. 2012).................................................................. 12, 45

*Spool v. World Child Int'l Adoption Agency*,
    520 F.3d 178 (2d Cir. 2008)............................................................................ 7

*St.-Works Dev. LLC v. Richman*,
    No. 13-cv-774, 2015 WL 872457 (S.D.N.Y. Feb. 3, 2015) ................................. 67

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)....................................................................................... 9

*United Trade Assocs. Ltd. v. Dickens & Matson (USA) Ltd., Inc.*,
    848 F.Supp. 751 (E.D. Mich. 1994)................................................................. 55

vi

*VIDIVIXI, LLC v. Grattan,*
    155 F.Supp.3d 476 (S.D.N.Y. 2016)............................................................ 67

*Weisman v. LeLandais,*
    532 F.2d 308 (2d Cir. 1976).................................................................... 8

**Statutes**

11 U.S.C. § 544 ................................................................................. 13

11 U.S.C. § 546(e) ......................................................................... 12, 13

11 U.S.C. § 547(b) ............................................................................. 13

11 U.S.C. § 548(a)(1)(A) ............................................................... 12, 43, 45

11 U.S.C. § 548(a)(1)(B) .................................................................... 13

11 U.S.C. § 548(c) ...................................................................... 9, 43, 44

**Rules**

Fed.R.Bankr.P. 7009 ......................................................................... 8

Fed.R.Bankr.P. 7012 ....................................................................... 4, 6

Fed.R.Civ.P. 8(a) .................................................................... 8, 51, 64

Fed.R.Civ.P. 9(b) .................................................................... 8, 51, 64

Fed.R.Civ.P. 12(b)(6) .............................................................. 4, 6, 8

Fed.R.Civ.P. 44.1 ............................................................................ 53

## PRELIMINARY STATEMENT

The above-entitled adversary proceeding is a "bad faith" clawback proceeding predicated upon the alleged "actual knowledge" of and "willful blindness" to the Ponzi scheme/fraud perpetrated by Bernard L. Madoff ("Madoff") on behalf of Bernard L. Madoff Investment Securities LLC ("BLMIS"). The "actual knowledge" that is attributed to all of the named defendants is based upon the purported "actual knowledge" of the BLMIS Ponzi scheme/fraud on the part of the defendant Yair Green ("Green"). Green is a resident and citizen of the State of Israel, and is a practicing attorney and reputable member of the Israeli bar since 1970, with an impeccable and unblemished record and untarnished reputation. In fact, Green is the recipient of three honorary degrees that have been bestowed upon him by prestigious academic institutions, those being Ben-Gurion University of the Negev in 2006 (an honorary doctorate), Bar-Ilan University in 2008 (an honorary doctorate), and the Jerusalem Academy of Music and Dance in 2015 (an honorary Trusteeship). In addition, Green previously served as a member of the Planning and Budgeting Committee of The Council for Higher Education of Israel. The allegations that have been leveled against Green in this proceeding are founded upon scurrilous and scandalous accusations having no basis in fact, and are designed and intended to besmirch Green's character before this Court and to distract the Court from the issues raised by this motion. Those allegations are completely untrue and are known to be false or should be known to be false by the plaintiff. The plaintiff's proclivity for making the same false statements repeatedly in his Second Amended Complaint ("SAC")[1] does not make those falsehoods true. Moreover, even if some or all of those allegations were true (which is strenuously denied), as is set forth below, they do not serve, either individually or collectively, to establish that Green had

---

[1] Capitalized terms not otherwise defined herein have the meanings ascribed to them in the SAC.

"actual knowledge" of the BLMIS Ponzi scheme/fraud or "willfully blinded" himself thereto.

It is also imperative for the Court to know that, as is set forth in Green's moving affidavit in support of the motion (the "Green Aff."), the overwhelming bulk of the funds that the Trustee seeks to recover—over $126 million of the almost $154 million sued for by the Trustee— constitute monies transferred by the defendant Magnify Inc. ("Magnify") to the defendant The Yeshaya Horowitz Association ("YHA"), for which entity Green served solely as legal advisor, and thereafter disbursed by YHA as charitable donations for the promotion and enhancement of scientific and medical research in Israel having universal implications for the betterment of mankind. *See* SAC Exs. A, B.  Some of the beneficiaries of those charitable bequests were: The Hebrew University of Jerusalem; Ben Gurion University of the Negev; Weizmann Institute of Science; Tel Aviv University; Bar Ilan University; The Israel Technion; Haifa University; Hadassah Medical Organization; Rambam Hospital, Haifa; Schneider Children's Hospital; and Sheba Medical Center. In addition, a portion of those charitable contributions were used to establish and fund the Center for the Study of Rationality within the Hebrew University, which has been the professional "home" of Professor Robert Aumann, whose research at that Center earned him a Nobel Prize in economics.

Thus, the Trustee's attempt to tar Green as the architect of a fraudulent scheme devised to benefit Green and his family and friends is false and known to be false by the Trustee. In fact, nothing could be further from the truth.

Finally, in adjudicating the liability of the defendants, and in particular in evaluating whether Green had "actual knowledge" of the BLMIS Ponzi scheme, the public perception of Madoff prior to his fall from grace must be taken into account. As was noted by a British Justice in a Judgment dismissing all claims brought in the liquidation proceeding of the London-based

2

English affiliate of BLMIS known as Madoff Securities International Ltd ("MSIL") against

Madoff's two sons, his brother, and others who had done business with Madoff and BLMIS as

investors or as directors of MSIL:

### (1) Introduction

. . . .

2.  During the three decades with which this case is concerned, Bernard Madoff enjoyed a reputation as a titan of Wall Street. Prior to the revelation of the fraud in December 2008, he was to the world a self made billionaire, regarded within the financial industry, by participants and regulators alike, as a successful businessman of high standing and integrity. His New York business filed audited statements of financial condition attesting to his enormous wealth and success. His stature was enhanced by senior positions he held with institutions at the heart of the US financial establishment. He served on several committees to advise the Securities & Exchange Commission; he was chairman of NASDAQ; he was vice chairman of the National Association of Securities Dealers; he was a director of the US Securities Industry Association. His reputation was not built on his investment advisory business, which turned out to be a Ponzi scheme, but on his proprietary trading and market making business, which was conducted conventionally and legitimately with envied success for over forty years.

. . . .

7.  It is necessary to keep firmly in mind that the conduct and state of mind of the Defendants in this case falls to be judged against the widespread contemporary perception of Bernard Madoff as a man of integrity, whose honesty in all his business dealings was taken for granted; and as a man whose success and high standing in the financial world caused his views on financial matters to command widespread deference and respect. [The defendants other than the members of Madoff's family] had no reason to suspect Bernard Madoff's fraud, and none for a moment did so. In common with the rest of the financial world, they believed Bernard Madoff to be a man of unquestioned probity whose high reputation and status was justified by his apparently formidable history of financial trading and investment.

. . . .

### (22) Conclusion and postscript

469.  All claims against each Defendant fail and are dismissed.

3

470. I cannot forbear from recording the commendable dignity and restraint which I have observed in [several defendants] throughout the trial. Bernard Madoff's fraud itself blighted their lives and tainted their good names simply by association, quite apart from the financial losses suffered by some from investments in the Ponzi scheme. To this was added the burden of this unfounded claim, making serious allegations of dishonesty, which threatened financial ruin and personal humiliation. . . . Their honesty and integrity has been vindicated.

*See* Ex. D[2]

Those very same considerations must be taken into account by this Court in adjudicating the plaintiff's contention that Green had "actual knowledge" of the BLMIS Ponzi scheme. The facts are to the contrary, and the allegations of the SAC are woefully deficient on that issue.

## RELIEF REQUESTED

This Memorandum of Law is submitted on behalf of the defendants Magnify, Premero Investments Ltd. ("Premero"), Strand International Investments Ltd. ("Strand"), YHA, Green, and Express Enterprises Inc. ("Express") (collectively, the "Defendants," and each individually a "Defendant")[3,4] in support of Defendants' motion to dismiss the SAC of the plaintiff Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC ("Plaintiff" or "Trustee") pursuant to Rule 12(b)(6) of the *Federal Rules of Civil Procedure* ("*Fed.R.Civ.P.*"), made applicable to this matter by Rule 7012 of the *Federal Rules of Bankruptcy Procedure* ("*Fed.R.Bankr.P.*"), as follows:

A. Count One as against Initial Transferee Defendants Premero and Green, but not as against the other Initial Transferee Defendants named therein, those being Magnify,

---

[2] Exhibits referred to herein as "Ex. __" are the Exhibits annexed to the moving affidavit of Yair Green.

[3] Defendants Magnify, Premero, Strand, and YHA are also sometimes referred to herein collectively as the "Accountholder Defendants" and individually as an "Accountholder Defendant," as they are the only Defendants who maintained accounts with BLMIS.

[4] Defendants Magnify, Premero, Strand, YHA, Green, and Express are also sometimes referred to herein collectively as the "Initial Transferee Defendants" and individually as an "Initial Transferee Defendant."

Strand, and YHA;

B. Count Two as against all Initial Transferee Defendants named therein (Magnify, Strand, Premero, YHA, and Green);

C. Count Three as against all Initial Transferee Defendants named therein (Magnify, Strand, Premero, YHA, and Green);

D. Count Four as against all Initial Transferee Defendants named therein (Magnify, Strand, Premero, YHA, and Green);

E. Count Five as against all Initial Transferee Defendants named therein (Magnify, Strand, Premero, YHA, and Green);

F. Count Six as against all Initial Transferee Defendants named therein (Magnify, Strand, Premero, YHA, and Green);

G. Count Seven as against all Initial Transferee Defendants named therein (Magnify, Strand, Premero, YHA, Green, and Express);

H. Count Eight as against the only Initial Transferee Defendant named therein (YHA); and

I. Count Nine as against all Accountholder Defendants named therein (Magnify, Premero, Strand, and YHA).

## GROUNDS FOR DISMISSAL

Counts One and Two of the SAC are subject to dismissal against the Initial Transferee Defendants Premero and Green because:

    a. With respect to the Two-Year Transfers received by Premero, the fictitious profits portion thereof has heretofore been settled by Premero, and there is no basis to find Premero liable for the principal portion thereof as there is no showing of "actual knowledge" of or "willful blindness" to the BLMIS Ponzi scheme/fraud on the part of Premero; and

    b. Green was not the recipient of any Two-Year Transfers, and there is no basis to hold him personally liable for any of the Two-Year Transfers received by Magnify, Strand, Premero, or YHA.

Counts Two, Three, Four, Five, Six, and Seven of the SAC are subject to dismissal against the Initial Transferee Defendants named therein pursuant to the "safe harbor" defense discussed in Point I, *infra,* as there is no basis for finding that any of the Defendants had "actual

5

knowledge" of the BLMIS Ponzi scheme/fraud.

Count Seven of the SAC is also subject to dismissal to the extent that it seeks to recover transfers that were made to Defendants prior to January 1, 2001, pursuant to the *Pre-2001 Transfers Decision* discussed in Point V, *infra*.

Count Eight of the SAC, which asserts a 90-day voidable preference claim against YHA, is subject to dismissal pursuant to the "safe harbor" analysis discussed in Point I, *infra*, as there is no basis for finding that YHA had "actual knowledge" of the BLMIS Ponzi scheme/fraud.

Count Nine of the SAC is subject to dismissal because the Trustee's equitable subordination claim fails to adequately allege that the Accountholder Defendants had "actual knowledge" of the BLMIS Ponzi scheme or acted in bad faith with respect thereto or in "reckless disregard" (i.e., "willful blindness") thereof.

All Counts of the SAC asserted against Green on the basis of alter ego/piercing the corporate veil liability are subject to dismissal pursuant to Point III, *infra*.

## STATEMENT OF FACTS[5]

The operative facts pertaining to this matter are set forth in the Green Aff. and the Exhibits annexed thereto. Those facts shall not be reiterated at length herein, but rather shall be incorporated into the Argument that follows.

## ARGUMENT

## STANDARDS OF REVIEW GOVERNING
## MOTIONS TO DISMISS

Pursuant to Rule 12(b)(6) of the *Fed.R.Civ.P.*, incorporated by *Fed.R.Bankr.P.* 7012, a motion to dismiss must be granted where a plaintiff is not entitled to relief based on the facts

---

[5] The non-conclusory factual allegations of the SAC that are not refuted by the documentary evidence annexed to the Green Aff. and referred to herein are accepted as true solely for purposes of this motion and are not otherwise admitted or conceded by Defendants.

alleged. *See Evercrete Corp. v. H-Cap Ltd.,* 429 F.Supp.2d 612, 620 (S.D.N.Y. 2006). In determining the motion, the court considers only well-pled factual allegations and "conclusions of law or unwarranted deductions of fact are not admitted," *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 771 (2d Cir. 1994), and "bald assertions and conclusions of law will not suffice," *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008) (internal quotation marks and citation omitted). *See also De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 70 (2d Cir. 1996). Moreover, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions . . . . Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007). *See also ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (same). Thus, a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Twombly,* 550 U.S. at 555). *See also Papasan v. Allain*, 478 U.S. 265, 286 (1986) (courts are "not bound to accept as true a legal conclusion couched as a factual allegation"). Pleadings that "are no more than [legal] conclusions[] are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (*quoting Twombly*, 550 U.S. at 570). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*.

The determination of whether a claim is plausible is "a context-specific task that requires

7

the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678. *See also Twombly,* 550 U.S. at 570. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal,* 556 U.S. at 678 (*quoting Twombly,* 550 U.S. at 557).

*Fed.R.Civ.P.* 9(b) (made applicable through *Fed.R.Bankr.P.* 7009) applies to claims for actual fraudulent transfer.[6] *See Picard v. Madoff* (*In re Bernard L. Madoff Inv. Sec. LLC*), 458 B.R. 87, 106 (Bankr. S.D.N.Y. 2011). To satisfy the Rule 9(b) pleading standard, a bankruptcy trustee must plead facts sufficient "to provide detailed notice of fraud claims to defending parties." *Id.* (internal quotation marks and citations omitted). "Such is not the case here where opacity, rather than particularity, best describe the allegations . . . ." *Id.* Thus, where a plaintiff fails to "provide factual allegations sufficient to raise a right to relief above the speculative level" or meet the requirements of Rule 9(b) of the *Fed.R.Civ.P.*, the claims must be dismissed. *Pappas v. Bank of Am. Corp.*, 309 F. App'x 536, 538 (2d Cir. 2009).

Although the issue before the court on a Rule 12(b)(6) motion "is not whether a plaintiff is likely to prevail ultimately, 'but whether the claimant is entitled to offer evidence to support the claims,'" (*Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir. 1995) (*quoting Weisman v. LeLandais,* 532 F.2d 308, 310-11 (2d Cir. 1976))), "[a] complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)," (*De Jesus,* 87 F.3d at 70 (internal quotation marks and citations omitted)).

On the issue of "actual knowledge," the SAC is replete with nothing more than vague and

---

[6] The pleading standard with respect to the Trustee's alter ego/piercing the corporate veil allegations under Rules 8 and 9 of the *Fed.R.Civ.P.* is set forth in Point III, *infra.*

conclusory allegations and devoid of any plausible factual showing, and with respect to the issue of "willful blindness," the SAC does not even contain any factual allegations whatsoever, never even mentioning "willful blindness" or any "red flags" giving rise thereto.

In addition, defenses that appear on the face of the complaint are properly before the court on a motion to dismiss. *See Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998) ("An affirmative defense may be raised by a pre-answer motion to dismiss under Rule 12(b)(6), without resort to summary judgment procedure, if the defense appears in the face of the Complaint."); *Balaber-Strauss v. Lawrence*, 264 B.R. 303, 307-08 (S.D.N.Y. 2001) (affirming bankruptcy court's dismissal on the pleadings based on application of Section 548(c) of the Bankruptcy Code (11 U.S.C. § 548(c))[7] in Ponzi scheme case). In the instant case, there are a multitude of affirmative defenses mandating dismissal of the SAC pursuant to, *inter alia*, the "safe harbor" cases, the "for value and in good faith" defense under § 548(c) of the Bankruptcy Code, the *Pre-2001 Transfers Decision,* and the laws of the British Virgin Islands and Panama with respect to the alter ego/piercing the corporate veil allegations of the SAC. *See infra* Points I, II, III, V.

In deciding motions such as this, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). A complaint is deemed to include any written document that is attached to the complaint as an exhibit, documents incorporated into the complaint by reference, and other documents "integral" to the complaint. Documents that the plaintiff relied on in bringing suit and that are

---

[7] For convenience, subsequent references to the Bankruptcy Code shall omit 11 U.S.C.

either in the plaintiff's possession or that the plaintiff knew of when bringing suit are also proper subjects for the court's consideration on a dismissal motion. *See, e.g., Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002); *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991); *McKevitt v. Mueller*, 689 F.Supp.2d 661, 665 (S.D.N.Y. 2010). "A document is integral to the complaint 'where the complaint relies heavily upon its terms and effect.'" *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (*quoting Chambers*, 282 F.3d at 153). *See also Picard v. Legacy Capital Ltd.* (*In re Bernard L. Madoff Inv. Sec. LLC*), 548 B.R. 13, 27 (Bankr. S.D.N.Y. 2016) (*"Legacy"*) ("A document is 'integral' to a complaint when the plaintiff has 'actual notice' of the extraneous information and relied on [it] in framing the complaint."). Where the complaint cites or quotes from excerpts of a document, the court may consider other parts of the same document submitted by the parties on a motion to dismiss. *See, e.g., 131 Main St. Assocs. v. Manko*, 897 F.Supp. 1507, 1532 n.23 (S.D.N.Y. 1995).

Moreover, where a plaintiff attempts to create a false impression in the complaint as to the material facts by hiding from the court documents which "give the lie" to the specious factual presentation, the court may consider such documents on a motion to dismiss. Plaintiffs "cannot willfully close their eyes to documents in their possession that are integral to their claims." *Highland Capital Mgmt. v. UBS Sec. LLC (In re Lyondell Chem. Co.)*, 491 B.R. 41, 50 (Bankr. S.D.N.Y. Apr. 10, 2013). "[I]f the plaintiff . . . knows about [a document] and intentionally chooses to disregard it, a moving defendant still may rely on that extrinsic matter in moving to dismiss, and the court need not subject that defendant, and the court system, to the additional expense and burden of considering that same matter later on a motion for summary judgment."

590854v.5

*Id.* at 50 n.48. *See also I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., Inc.*, 936 F.2d

759, 762 (2d Cir. 1991) ("We therefore decline to close our eyes to the contents of the

[document] and to create a rule permitting a plaintiff to evade a properly argued motion to

dismiss simply because plaintiff has chosen not to attach the [document] to the complaint or to

incorporate it by reference."); *Cortec*, 949 F.2d at 44 ("Plaintiffs' failure to include matters of

which as pleaders they had notice and which were integral to their claim—and that they

apparently most wanted to avoid—may not serve as a means of forestalling the district court's

decision on the motion."). As one court put it:

> [A]ny reference to several important . . . documents has been inexplicably and improperly
> omitted from the Amended Complaint, thereby creating a demonstrably false impression
> of certain key facts[.] . . . When plaintiffs fail to include any reference to documents that
> they knew of that are integral to their claim, there is no need for the court to convert the
> motion to a summary judgment motion in order to take them into account. . . . In this
> case, the rule just discussed means the Court can consider . . . all critically important
> documents that Plaintiffs' counsel has elected not to refer to in the complaint (*I assume
> because they give the lie to several key allegations of "fact" in the amended pleading*).

*Ginx, Inc. v. Soho Alliance*, 720 F.Supp.2d 342, 345, 352 (S.D.N.Y. 2010) (emphasis added). All

of the documents relied upon by Defendants and submitted as Exhibits in support of the motion

at bar fit within the aforesaid guidelines and are proper subjects for the Court's consideration.

And where the allegations of the SAC are contradicted by such documents "the document[s], and

not the allegations, control[], and the court need not accept such allegations as true." *Highland*,

491 B.R. at 50.

## POINT I

### THE SECOND AMENDED COMPLAINT FAILS TO ADEQUATELY ALLEGE "ACTUAL KNOWLEDGE," THEREBY MANDATING THE DISMISSAL OF COUNTS TWO THROUGH EIGHT THEREOF

Counts Two through Eight of the SAC all assert claims that are subject to the "safe

harbor" defense that the courts have made applicable to the Trustee's "clawback" claims in the

11

BLMIS matter. In order to sustain such claims, the Trustee must adequately allege that the transferees from whom it seeks to recover alleged fraudulent conveyances under any statute other than § 548(a)(1)(A) of the Bankruptcy Code had "actual knowledge" of the BLMIS Ponzi scheme, meaning actual knowledge that BLMIS was not engaged in the trading of securities.

In this case, the Trustee rests his entire case of actual knowledge upon what he claims to be the actual knowledge of Green, which he then seeks to impute to all of the other Defendants. Thus, if the SAC fails to adequately allege that Green had the requisite actual knowledge, the Trustee's entire case on that issue falls apart like the house of cards it really is.

After being hotly contested for several years, the law on this issue is now established. This Court has already repeatedly noted that the Trustee's ability to avoid and recover transfers has been limited by several decisions issued by the United States Court of Appeals for the Second Circuit and the United States District Court for the Southern District of New York. In light of the safe harbor granted under § 546(e) of the Bankruptcy Code, the Trustee may only avoid and recover intentional fraudulent transfers under § 548(a)(1)(A) made within two years of the filing date, (*Picard v. Katz*, 462 B.R. 447, 453-54 (S.D.N.Y. 2011) ("*Katz*"), *abrogated on other grounds*, 513 B.R. 437 (S.D.N.Y. 2014); *SIPC v. BLMIS (In re Madoff Sec.)*, 476 B.R. 715 (S.D.N.Y. 2012) ("*Greiff*"); *Picard v. Ida Fishman Revocable Trust (In re BLMIS)*, 773 F.3d 411, 423 (2d Cir. 2014) (*"Ida Fishman"*)), unless the transferee had actual knowledge of Madoff's Ponzi scheme, or more generally, "actual knowledge that there were no actual securities transactions being conducted." *SIPC v. BLMIS (In re Madoff Sec.)*, No. 12-MC-115, 2013 WL 1609154, at *4 (S.D.N.Y. Apr. 15, 2013) ("*Cohmad*"). The District Court placed the burden on the Trustee to plead and prove the transferee's subjective knowledge. *See id.* In other words, when the § 546(e) safe harbor applies, the Trustee's claims pursuant to New York law

12

(state law fraudulent transfer claims under the New York Debtor and Creditor Law made applicable under § 544 of the Bankruptcy Code) and preference and constructive fraudulent transfer claims pursuant to the Bankruptcy Code (claims under §§ 547(b) and 548(a)(1)(B) of the Bankruptcy Code) are barred and must be dismissed. The safe harbor was intended, among other things, to promote the reasonable expectations of legitimate investors. If an investor knew that BLMIS was not actually trading securities, he had no reasonable expectation that he was signing a contract with BLMIS for the purpose of trading securities for his account. *See id.* In that event, the Trustee can avoid and recover preferences and actual and constructive fraudulent transfers to the full extent permitted under state and federal law. *See id.* at *6, 10. The aforesaid legal principles have been recited repeatedly by this Court in *Picard v. Avellino (In re BLMIS)*, 557 B.R. 89, 112-13 (Bankr. S.D.N.Y. 2016) ("*Avellino*"), *Picard v. Legacy Capital Ltd (In re BLMIS)*, 548 B.R. 13, 28-29 (Bankr. S.D.N.Y. 2016) ("*Legacy*"), *Picard v. Shapiro (In re BLMIS)*, 542 B.R. 100, 111-12 (Bankr. S.D.N.Y. 2015) ("*Shapiro*"), and *Picard v. Merkin (In re BLMIS)*, 515 B.R. 117, 137-39 (Bankr. S.D.N.Y. 2014) ("*Merkin*").

With respect to the issue of whether an alleged transferee sued by the Trustee had actual knowledge of the BLMIS fraudulent scheme, several prior decisions of this Court are instructive, and the findings therein, when compared to the Trustee's allegations against Green, lead to the inescapable conclusion that Green did not possess actual knowledge that BLMIS was engaged in operating a Ponzi scheme and was not actually trading securities. The SAC's allegations with respect thereto fail to sustain the Trustee's burden at the pleading stage, as those allegations are either completely conclusory or are made of whole cloth, being alleged upon unfounded information and belief and/or being patently false. In addition, some of those allegations are contrary to and contradicted by other allegations of the same pleading, making the SAC

13

inherently inconsistent and unreliable, and thus implausible. Finally, the Trustee's scandalous and scurrilous allegations, directed primarily and almost exclusively against Green's good character and sterling reputation, even if true, do not serve to establish Green's actual knowledge, as they focus on Green's purported dishonesty and self-dealing (all of which is strenuously denied) having nothing to do with the affairs of BLMIS and not in any way, shape, or form serving to establish that Green knew that BLMIS was running a Ponzi scheme.

Prior decisions of this Court on the issue of actual knowledge, several of which found there to be actual knowledge and several of which found actual knowledge to be lacking, provide a useful backdrop for consideration of this issue.

In *Merkin,* this Court found there to be no actual knowledge despite the fact that the complaint at issue in that matter adequately alleged that (a) Merkin and Madoff shared a close business and personal relationship, (b) Merkin had personal access to Madoff and could speak with him directly, including meeting Madoff at BLMIS, (c) Merkin knew that BLMIS could not have been legitimately engaged in the trading activity it reported, and that the trades were a fraud and Madoff was running a Ponzi scheme, as Merkin was told by a third party that the BLMIS trading was impossible and could be a Ponzi scheme, (d) Merkin kept a folder containing a document prepared by a third-party analyst questioning the possibility of BLMIS' returns, (e) Merkin made numerous comments questioning the impossibility of the volume of Madoff's trading activity, comparing it to Charles Ponzi's scheme, and warning others not to invest significant amounts with BLMIS for the long term, (f) Merkin knew that the options trading by BLMIS were impossible and demonstrated that BLMIS was not actually making those trades, (g) Merkin expressed a laundry list of concerns about BLMIS to a company researching BLMIS for him, (h) Merkin expressed to investors his concerns about Madoff and BLMIS and conveyed the

14

"probability" in his own mind that BLMIS could be a fraud, (i) the investments with BLMIS violated the investment strategies of Merkin's investment funds, (j) Merkin concealed Madoff's involvement with his funds and the delegation to Madoff of Merkin's role as the money manager and person making the investment decisions for the funds, (k) in the exercise of his due diligence on BLMIS as a third-party money manager for his funds, Merkin knew that there were various indicia of fraud that applied to BLMIS (including that it was a self-owned broker-dealer, that it had a questionable accounting firm, and that it had an unusual pricing or fee structure) and did not make any additional inquiries into BLMIS' operations because he knew that those indicators of fraud applied to BLMIS, and (l) the documents in Merkin's possession identified numerous trading impossibilities and suspicious information, including the following facts that indicated Madoff's fraudulent scheme: (1) lack of transparency, (2) consistent returns, (3) trades outside the daily range, (4) lack of scalability, (5) impossible trade volumes, (6) impossible timing of trades, (7) option trades that were not properly identified by CUSIP numbers, (8) negative cash balances in accounts that were not margin accounts, (9) unusual fee structure, (10) lack of an independent custodian for its securities, (11) lack of real-time electronic access to accounts and trade confirmations, (12) strip mall auditors, (13) industry skepticism and suspicions, and (14) liquidity problems on the part of BLMIS. *See Merkin*, 515 B.R. at 128-34.

In defining "actual knowledge," this Court relied upon dictionary definitions of "knowledge" and concluded: "Thus, 'actual knowledge' implies a high level of certainty and absence of any substantial doubt regarding the existence of a fact." *Id.* at 139.

Despite accepting the "principal nonconclusory allegations" of the complaint in *Merkin* that (a) Merkin openly admitted that Madoff appeared to be operating a Ponzi scheme that was bigger than Ponzi's, (b) Merkin warned of the dangers of investing significant amounts for the

15

long term with BLMIS, (c) Merkin conveyed the impression that there was a probability in his

own mind that BLMIS could be a fraud, (d) Merkin was warned that BLMIS' performance was

impossible and could be a Ponzi scheme, (e) Merkin warned others that he was unable to

adequately investigate BLMIS' legitimacy, (f) Merkin was aware that the options markets lacked

the volume necessary to sustain BLMIS' option trading, (g) Merkin articulated concerns about

fraud to Madoff, (h) Merkin told Madoff (following the disclosure of the Bayon Group Ponzi

scheme) that whenever a scam occurred in the hedge fund industry, someone would call about

Madoff, and (i) Merkin maintained a folder designated "Madoff" that contained documents and

analyses noting the lack of correlation between the performance of BLMIS' investments and the

S&P 500, this Court nevertheless found and concluded:

> The [complaint's] allegations do not imply the level of certainty or absence of substantial doubt associated with actual knowledge. . . . These . . . allegations [that Merkin admitted that Madoff "appeared" to be running a Ponzi scheme; that Merkin conceded that BLMIS "might" be a Ponzi scheme; that Merkin's mental state seemed to indicate that there was "some probability" in Merkin's mind that BLMIS was a fraud] connote a strong suspicion but not the absence of doubt associated with actual knowledge. Similarly, [the] warning to Merkin that BLMIS "could be a Ponzi scheme," does not imply that BLMIS is a Ponzi scheme or that Merkin agreed with [that] assessment and accepted [that] statement as an established fact. Furthermore, Merkin's quip . . . about renaming the "Ponzi scheme" the "Madoff scheme" and his statement to Madoff after news of the Bayon Group scandal broke seem more like jokes than acknowledgements that BLMIS was a Ponzi scheme. Finally, the allegations regarding the conversations [that Merkin admitted that he was unable to adequately investigate BLMIS' legitimacy and was aware that the options markets lacked the volume necessary to sustain BLMIS's option trading] and the maintenance of the "Madoff" folder merely confirm Merkin's suspicions that something was not right with BLMIS.
>
> Accordingly, the Court concludes that the [complaint] fails to plausibly allege that Merkin had actual knowledge of Madoff's Ponzi scheme.

*Id.* at 140-41.

16

As is hereinafter set forth, the allegations of Green's purported "actual knowledge" set forth in the SAC pale in comparison to the allegations that were leveled against Merkin and found to be deficient by this Court.

In *Legacy,* this Court also discussed a litany of factors impacting the "actual knowledge" issue based upon the well-pleaded factual allegations of the complaint. Those factors consisted of (a) a document known as the "Renaissance Report" that was shared with an officer of Legacy, which found that (i) the market could not support the volume of options Madoff purported to trade, (ii) a very high percentage of BLMIS' purported equity trades were bought below the daily closing price and sold above the daily trading price, (iii) a simulation of Madoff's trading strategy put him in the market on days the account statements showed he was out of the market, and (iv) Madoff's ability to trade billions of dollars without leaving a footprint was a mystery, and (b) the defendants' knowledge of market impossibilities and indicia of fraud, which came about because (1) the defendants knew that BLMIS' purported options trading was impossible, (2) the defendants knew that the timing of Madoff's trades was impossible, (3) the defendants were aware of Madoff's unusual fee structure, (4) the defendants knew that BLMIS' enormous trading volume never impacted the market, (5) the defendants knew that BLMIS' rates of return were impossible, (6) the defendants knew that BLMIS' operations lacked transparency and controls, (7) the defendants were aware that BLMIS did not have a capable auditor, (8) the defendants knew that BLMIS reported trades outside of the daily range, (9) the defendants knew that the BLMIS account statements showed impossible dividends, (10) the defendants knew that BLMIS purported to engage in speculative options trading that deviated from its specified investment strategy (the "split-strike conversion" strategy), (11) the defendants knew that the options confirmations issued by BLMIS reflected trades that were inconsistent with its "split-

17

strike conversion" strategy, (12) the defendants were aware that options collars purportedly executed by BLMIS were not properly balanced with changes to the composition of the equities basket, (13) the defendants knew that the BLMIS account statements showed illegal, unauthorized margin trades, and (14) the defendants were aware that they were not getting real-time electronic access to accounts and trade confirmations. *See Legacy*, 548 B.R. at 18-24.

After reviewing the aforesaid factors, this Court reiterated the definition of "actual knowledge" set forth in *Merkin* and ruled as follows:

> [T]he sufficiency of the [complaint] comes down to the question of whether the information acquired by Khronos [an affiliated service provider] as a result of its due diligence provided Legacy with actual knowledge that BLMIS was not engaged in trading securities. The knowledge imputed to Legacy through [its officer], particularly the Renaissance Report and the emails cited by the Trustee, raised strong suspicions about BLMIS' trading but no more. . . . Thus, the only basis for Legacy's actual knowledge would be what it learned through Khronos.
>
> . . . While it aroused suspicions regarding how Madoff did what he said he did, the Renaissance Report did not conclude that Madoff's operation was a Ponzi scheme or that BLMIS was not actually making the trades it was reporting. . . . In short, the Renaissance Report failed to conclude that BLMIS was not actually engaged in trading securities . . . .
>
> The issuance of the Renaissance Report was followed by emails . . . that raised concerns about BLMIS' purported trading activities as well as the structure of BLMIS . . . .
>
> . . . .
>
> The Renaissance Report and the emails relied on by the Trustee confirm that [the authors of that report and the recipients thereof, including an officer of Legacy] were highly suspicious of Madoff's option trades and his uncanny ability to time his equity trades to minimize the purchase price and maximize the sale price. They were also troubled by Madoff's unusual fee structure, rumors of cherry picking, the fact that his massive trades did not impact the market, the employment of his son and the mistaken belief that BLMIS employed his brother-in-law as BLMIS' accountant.

18

> But the allegations of the [complaint] do not plead a plausible claim
> that they actually knew that Madoff was not trading securities. . . .

*Legacy*, 548 B.R. at 29-31.

This Court then noted that since it is common knowledge that a Ponzi scheme will inevitably collapse, it defines credulity and is simply not plausible that someone, especially a professional owing fiduciary duties to others (like attorney Green to his clients) would knowingly invest his clients' monies in a Ponzi scheme that is doomed to collapse, citing other cases where with respect to "the dubious task of plausibly pleading that the defendants knowingly invested in a Ponzi scheme," it was concluded that such a pleading would be implausible, and that it was "bordering on the absurd" to think that anyone would knowingly give money to an entity operating a Ponzi scheme that was doomed to failure. *Legacy*, 548 B.R. at 32 (internal quotation marks and citations omitted). In this case, it is just as implausible and absurd to think that Green would leave approximately $770 million on deposit in Magnify's BLMIS accounts if he knew that BLMIS was running a Ponzi scheme, particularly as the Trustee claims throughout the SAC that Green's control over Magnify enabled him to do whatever he wished with Magnify's investments.

Next, this Court went on to discuss the so-called "red flags" that were known to Legacy and its affiliated co-defendant Khronos regarding market impossibilities and indicia of fraud, and rejected the Trustee's reliance thereon.

> The "red flag" theory of *scienter* has been rejected in the Madoff-
> related federal securities law litigation because it amounts to pleading
> fraud by hindsight. . . . When the red flags are viewed in real time,
> "the more compelling inference as to why Madoff's fraud went
> undetected for two decades was his proficiency in covering up his
> scheme and deceiving the SEC and other financial professionals."
>
> . . . The plaintiff must plead non-conclusory allegations that support
> the inference that the defendants actually knew that Madoff was not
> trading securities. Alleging actual knowledge based on the existence

19

of red flags amounts to pleading that the defendant . . . knew *or should have known* that BLMIS was not engaged in the actual trading of securities. This is the objective standard of knowledge rejected by the District Court. Although the Trustee, the SEC and everyone else can look back today and connect the dots with the benefit of hindsight, the inference that [defendant] did so before Madoff's fraud was publicly exposed is not as plausible as the inference that, like mostly everyone else, [defendant] missed it.

. . . The notion that [defendant] discovered through its diligence that Madoff was a fraud is implausible. If [it was] actually confirmed that Madoff was engaged in securities fraud, or worse, that he was running a Ponzi scheme, why would Legacy remain invested in BLMIS and increase its investment . . . ? . . . The only plausible explanation is that like everyone else that Madoff fooled, [defendant] did not uncover in real time what the Trustee and everyone else discovered with the aid of hindsight.

. . . .

In conclusion, the [complaint] does not allege a plausible claim that Legacy had actual knowledge that BLMIS was not engaged in trading securities.

*Legacy*, 548 B.R. at 33-35 (citations omitted; emphasis in original).

Once again, as is set forth below, when the *Legacy* guidelines are applied to this case, the only plausible conclusion is that Green had no actual knowledge that BLMIS was running a Ponzi scheme and was not actually engaged in the trading of securities.

The cases in which the Court found there to be no "actual knowledge" are not the only cases that are useful in this analysis. Several decisions in which actual knowledge was found to be adequately alleged are also instructive on this issue.

In *Shapiro*, the actual knowledge inquiry was focused upon Stanley Shapiro ("Stanley"). The well-pleaded factual allegations of the complaint adequately alleged that Stanley knew of the fraud at BLMIS because (a) Stanley enjoyed unusual access to Madoff and others involved in the investment advisory business of BLMIS, and was hired by Madoff in 1995 as a salaried, part-time consultant and proprietary trader at BLMIS with a 19th floor office adjacent to Madoff's

20

office, (b) at Madoff's direction, in 1996 Stanley hired Paul Konigsberg ("Konigsberg") as his

accountant to provide tax and other advice relating to the accounts of Stanley and his family, and

Konigsberg pleaded guilty in 2014 to a criminal information regarding, *inter alia*, falsifying

BLMIS's books and records, and admitted at his plea hearing that he conspired with others to

falsify the books and records of BLMIS and to obstruct the administration of federal tax law, (c)

Konigsberg regularly provided Stanley with schedules of his purported gains and losses in the

BLMIS accounts of Stanley and his family, (d) Stanley met frequently with Madoff and spoke

with him by telephone dozens of times, (e) Stanley and his wife traveled with Madoff and his

wife on a private jet more than twenty-five times between 2002 and 2008, (f) Annette Bongiorno

("Bongiorno"), a BLMIS employee convicted of fraud and other crimes in connection with

Madoff's Ponzi scheme, worked on BLMIS's notorious 17th floor from where she personally

managed the accounts of Stanley and his family and worked closely with Stanley, (g) Stanley

visited the 17th floor more than 150 times between 2005 and 2008, (h) the accounts at issue

earned implausible, even impossible, rates of return, (i) Stanley closely monitored and managed

his family's accounts and regularly directed BLMIS to generate specific gains and losses, (j)

Stanley could "cancel" trades in the accounts and directed BLMIS and Bongiorno to cancel

purported trades previously reported on monthly statements, (k) near the end of every year, in

order to reduce projected tax liability, Stanley directed BLMIS to generate short-term gains and

losses for tax purposes, and Bongiorno did so by back-dating short-term stock purchases and

sales so as not to disturb the long-term buy and hold strategy BLMIS purportedly employed for

Stanley's accounts, (l) during 2002 and 2003, Stanley caused BLMIS to fabricate large groups of

backdated trades in his accounts, and at Stanley's request (i) BLMIS fabricated revised 2002

monthly statements to reverse millions of dollars in previously reported paper losses and, at the

direction of BLMIS, Stanley and Konigsberg returned the original monthly statements previously issued to them before BLMIS would then issue revised statements to them, and (ii) BLMIS fabricated numerous groups of trades in 2003 in order to generate millions in reported losses to eliminate an apparently huge tax liability. *Shapiro*, 542 B.R. at 104-08.

Based upon the foregoing allegations, in particular (a) that Stanley was a long-time Madoff associate and former BLMIS employee who had direct access to Madoff, Bongiorno, and the notorious 17th floor from which the Ponzi scheme was run, (b) that between 2005 and 2008 alone, Stanley had visited the 17th floor on more than 150 occasions, (c) that Stanley (directly or indirectly) or his family withdrew significantly more from their BLMIS accounts than they invested, (d) that Stanley collaborated with and directed BLMIS personnel, including Bongiorno, to "cancel" trades that appeared on earlier monthly statements, to generate specific gains or losses, sometimes back-dated to before the request, and during 2002 and 2003, to fabricate large numbers of back-dated trades to increase the value of his accounts, and thereafter, to manufacture back-dated losses to eliminate the adverse tax consequences resulting from the fictitious value, and (e) that after BLMIS created fictitious, back-dated trades that had not appeared in the original monthly statements, but before it would give Stanley the revised statements, Stanley (and Konigsberg) had to return the original statements to BLMIS, this Court found that "the Trustee has pleaded that Stanley knew, at a minimum, that BLMIS was not actually trading the securities it reported it had traded in the monthly statements relating to [Stanley's accounts]," thereby sustaining the Trustee's allegation that "at a minimum, [] Stanley had actual knowledge that there were no actual securities transactions being conducted." *Shapiro*, 542 B.R. at 112-13 (internal quotation marks and citation omitted).

The Trustee's allegations against Green do not come anywhere close to the Trustee's

22

allegations against Shapiro, and, as is set forth below, the allegations leveled against Green are either conclusory and unsupported by fact or are demonstrably false, and, even if true, do not serve to establish Green's actual knowledge of the BLMIS Ponzi scheme.

*Picard v. Ceretti (In re BLMIS)*, Nos. 08-01789, 09-01161, 2015 WL 4734749 (Bankr. S.D.N.Y. Aug. 11, 2015) (*"Kingate"*) involved BLMIS feeder funds and their principals. This Court found that the complaint in *Kingate* plausibly alleged that the defendants knew that Madoff was not engaging in the securities transactions he reported and that many of the entries in the statements and trade confirmations issued to the defendants depicted trades that could not have taken place. *Id.* at *13. In addition, the defendants were warned internally by their asset management company and investment adviser company that BLMIS had not been subjected to their rigorous due diligence standards and that they could not perform due diligence because it was impossible to go inside BLMIS, which was a sign of fraud. *Id.* Despite the deficient due diligence, the defendants closely monitored the performance of the funds on a regular basis, and their review disclosed impossible trades, such as 281 equity and option trades between 1998 and 2008 that fell outside the daily price range. *Id.* at *14. In addition, they were aware of 432 occasions on which companies supposedly paid dividends on dates that were inconsistent with industry practice, and their monthly statements disclosed (a) trades on margin even though the funds did not maintain margin accounts, (b) settlement dates that were inconsistent with industry practice, (c) option trades that did not identify counterparties, and (d) over-the-counter option trades that included CUSIP numbers when they should not have. *Id.* The defendants also shielded Madoff from investor inquiries and deflected those inquiries away from Madoff and refused to let the funds' auditor, PricewaterhouseCoopers ("PwC"), independently verify the information provided by BLMIS's strip-mall auditor and expressed concern about PwC asking questions

590854v.5

about Madoff, implying unease about what PwC might discover if those inquiries were pursued. *Id.* at \*14. Based upon the foregoing, this Court concluded: "The totality of the allegations in the [complaint] paint a picture of sophisticated financial professionals who knew that Madoff was reporting fictitious transactions, and took steps to prevent any inquiry." *Kingate*, 2015 WL 4734749 at \*13-15.

The allegations against Green in the SAC do not compare to the allegations upon which the Court found there to be actual knowledge in *Kingate*.

In *Avellino,* the Court found there to be actual knowledge on the part of one of two accountants who were partners in an accounting firm. *Avellino* is significant both for what the Court rejected as being a predicate for actual knowledge and what the Court found as being the basis for actual knowledge of only one of the two accounting partners.

First, the Court found that the two accountants' knowledge that Madoff had created records of fictitious, back-dated trades to dupe the SEC in an investigation being conducted by that regulatory authority did not suffice, because "while the fraud perpetrated on the SEC was reprehensible, it was also focused and specific" and "does not support the inference that Avellino or Bienes knew that Madoff was also defrauding his customers or not engaged in the trading of securities on their behalf." *Avellino*, 557 B.R. at 114. Second, the Court rejected the Trustee's contention that actual knowledge was established by the fact that Avellino and Bienes took steps to circumvent the injunction issued in favor of the SEC ordering them to refrain from various acts that violated the federal securities laws, including (a) creating interconnected "dummy" entities to conceal their continued involvement with BLMIS and avoid regulatory scrutiny of that continuing relationship, and (b) redirecting their former investors to other feeder funds that invested with Madoff and received commissions based on those re-investments that they steered

24

to Madoff. *Id.* at 100, 115. With respect thereto, this Court concluded that "this alleges

dishonesty and implies greed, but does not support the inference that Avellino or Bienes, or both,

knew that Madoff was not actually engaged in trades with the money they were funneling to

him." *Id.* at 115. Third, although the complaint identified several red flags, including impossibly

consistent annual returns, trading impossibilities, impossible options trading volumes,

transactions outside the daily price range, back-dated trades, and the use of an incapable, strip-

mall auditor, this Court referred to *Legacy* wherein it "observed that the 'red flag' theory of

*scienter* had been rejected in Madoff-related federal securities law litigation because it was based

on hindsight and required  clairvoyance," and concluded: "For the same reasons, the red flags

identified by the Trustee do not support a plausible  inference that Avellino or Bienes had actual

knowledge that Madoff was not trading securities." *Id.* at 115. Finally, the Court found that what

was known as the "Schupt" process[8] gave rise to plausible allegations that Avellino, but not

Bienes, had actual knowledge. "The Schupt process, on the other hand, plausibly implies that at

least Avellino knew that he was withdrawing or causing the withdrawal of funds from A&B-

related accounts that included fictitious trades." *Id.* at 116. "Assuming the truth of the allegations

as I must, there is no plausible explanation for this method of paying commissions other than the

one that the Trustee suggests. . . . Given Avellino's degree of involvement in directing BLMIS

employees regarding the execution of the Schupt process, it is plausible to infer that he was an

active and knowing participant in the allocation of fictitious profits from imaginary options

trades to the A & B-related account. He knew, therefore, that Madoff and BLMIS were not

---

[8] Avellino and Bienes had negotiated a promised rate of return with Madoff, and in order to achieve that guaranteed
rate of return, the BLMIS employees tracked the accounts in what was internally referred to at BLMIS as calculating
the "Schupt." The "Schupt" was achieved through fictitious option trades that resulted in gains equaling the amount
of the Schupt payment. At least annually, Avellino calculated the shortfall, if any, on the guaranteed rate of return,
and if the return was less than what had been promised, Avellino communicated with Madoff and Frank DiPascali
("DiPascali") of BLMIS, and they would then manufacture fictitious trades to make up the difference. *Avellino*, 557
B.R. at 100-02.

actually engaged in trading securities, at least to the extent of the Schupt process." *Id.* With respect to Bienes, however, the Court found: "On the other hand, the allegations as to Bienes' knowledge of and consent to Avellino's Schupt activities are entirely conclusory, and do not support the inference that Bienes knew the Schupt payments were satisfied [by fictitious trades]. *Id.* at 116, n. 21.

Nothing remotely like the Schupt process has been alleged regarding Green, and, as it did with Bienes, the Court should dismiss all of the Trustee's claims that are based upon Green's purported actual knowledge.

One more prior decision of this Court on the actual knowledge issue is worthy of mention, that being *Picard v. Estate of Mendelow (In re BLMIS)*, 560 B.R. 208 (Bankr. S.D.N.Y. 2016) (*"Mendelow"*). That case involved a motion for leave to amend the complaint rather than a motion to dismiss the complaint. However, with respect to the issue of actual knowledge, the considerations are the same.

Mendelow was an accountant and a financial advisor. *See Mendelow*, 560 B.R. at 213. He was also a sophisticated investor. *See id.* For 20 years his accounting firm shared an office with Avellino & Bienes, and he was a principal at his firm for 11 years, at which point it merged with Konigsberg Wolf & Co. P.C. *See id.* Mendelow opened accounts at BLMIS for himself, his wife and children, and two funds that he formed. *See id.* He received the BLMIS account statements for all of those accounts and also received BLMIS account statements for several of his accounting clients who were invested with BLMIS. *Id.* at 213-14.

According to the allegations of the proposed amended complaint, Mendelow had a long-standing relationship with Madoff, and owned and operated one of the earliest BLMIS feeder funds, which was shut down by the SEC for violating securities laws pursuant to a consent

26

decree which enjoined Mendelow and his partners to the same extent as the injunction against Avellino & Bienes. *See id.* at 214-15. Thereafter, pursuant to the efforts of Avellino, Madoff agreed to a new deal with Mendelow that would provide Mendelow with financial rewards that mimicked the profit structure of Avellino & Bienes and Mendelow's disbanded fund. *See id.* at 215. Those financial benefits included (a) a guaranteed return of 17% in Mendelow's new BLMIS accounts, and (b) added value to certain designated Mendelow accounts through the allocation of fictitious options transactions ("Extra P&L") based on the amount of money Mendelow's former fund's clients reinvested directly with BLMIS. *Id.*

Because of the aforesaid arrangements, Mendelow encouraged the former investors in his disbanded fund to reinvest with BLMIS, and in exchange Madoff provided Mendelow with the guaranteed return of 17% in the BLMIS accounts of Mendelow and his family and the Extra P&L. *Id.* at 215-16. According to the Trustee, Mendelow knew that it was impossible for Madoff to guarantee and consistently deliver a pre-determined return if he was actually trading securities, and also knew that near the end of every year, BLMIS officer DiPascali examined the accounts in which Madoff had promised a guaranteed return to see if they had hit their mark. *See id.* at 215. If there was a shortfall, the same "Schupt" process as was used for Avellino & Bienes was used for the accounts of Mendelow and his family. *See id.* at 216. In addition, all Extra P&L was generated through fictitious options transactions, and Mendelow directed into which accounts that extra money was to be credited. *See id.* at 216-17. Mendelow closely monitored his accounts to ensure that BLMIS provided the guaranteed returns and the Extra P&L, working closely with DiPascali to apportion the fictitious options transactions where he wanted them. *See id.* at 217.

In addition, and of the utmost significance, at a Federal Bankruptcy Rule 2004 examination by the Trustee, Mendelow invoked his Fifth Amendment right against self-

incrimination over 390 times, refusing to answer virtually every question, including those focused on his knowledge of Madoff's Ponzi scheme. *Id.* at 219.

In ruling that Mendelow had actual knowledge of the BLMIS Ponzi scheme, this Court found:

> Like Avellino, Mendelow was also an active participant in calculating the Schupt payments necessary to hit his 17% guaranteed rate of return and Extra P&L. The Schupt payments were manufactured by BLMIS through fictitious options trades allocated . . . as directed by Mendelow. . . .
>
> . . . .
>
> . . . The Court will draw an adverse inference regarding Mendelow's knowledge of Madoff's fictitious trading activities from Mendelow's refusal to answer [questions regarding: the impossibility of guaranteed rates of return; the impossibility of never suffering a loss; the inclusion of false securities transactions on his BLMIS statements; that the trading reflected on his BLMIS account statements was fictitious and the product of fraud; that Madoff was opening a Ponzi scheme; that fictitious option trades were added to his BLMIS accounts to meet the guaranteed rate of return promised by Madoff and his finder's fee] as a factor in its determination that the [proposed amended complaint] is not futile.

*Id.* at 226-27.

Having established the framework of the Court's prior rulings on actual knowledge, the allegations of Green's actual knowledge set forth in the SAC must now be evaluated under those guidelines.

The SAC repeatedly alleges, in completely conclusory terms, that: "the Defendants knew BLMIS was a fraud," (¶ 3)[9]; "Green was actively participating in the fraud," (¶ 9); "[t]he history of these Accounts demonstrates Green's actual knowledge of—and participation in—BLMIS's fraud," (¶ 10); "after Green took control of Magnify and YHA at the end of 1989, the Magnify

---

[9] Unless otherwise indicated herein, references to "¶ __" refer to paragraphs of the SAC.

28

Accounts began to show blatant fictitious trades and Green eventually came to participate with Madoff in the creation of Portfolio Evaluations reflecting no trades at all," (¶ 75); "Green knew and participated in the fraudulent reporting of the Magnify Accounts as reflected in the Portfolio Evaluations" and by virtue thereof "Green knew that the gains reflected in the Magnify, Strand, and Premero Accounts were not created by securities trading, and BLMIS obviously had no records of such trades," (¶ 105); "Green knew [BLMIS] was a fraud," (¶ 114); and "Green knew that Madoff was engaged in a fraud and not trading actual securities, and knowingly participated in that fraud," (¶ 127). As these conclusory allegations are untrue, it is no surprise that they are devoid of factual support. All such conclusory allegations must be rejected as a basis for finding actual knowledge.

The SAC devotes ¶¶ 76-89 and 115 to allegations regarding the opening of the second Magnify BLMIS Account with what the Trustee claims were fictitious trades involving approximately $120 million of MCI Communications ("MCI") stock in 1990, when such account was opened. *See* Ex. H (Magnify customer statement dated 9/30/90). The legitimacy of those transactions involving MCI stock is not ripe for decision upon the instant motion. The determination of the *bona fides* of those transactions will have a substantial impact upon the calculation of the net equity of the BLMIS Accounts of Magnify and the BLMIS Accounts of YHA and Strand (which thereafter received transfers from those Magnify Accounts) on the cash in/cash out method of determining net equity. *See* Green Aff. ¶ 16. With respect thereto, these issues are inextricably intertwined with the still unresolved dispute over when the BLMIS Ponzi scheme actually began, since the MCI trades challenged by the Trustee purportedly occurred in 1990, and it has not yet been determined when the Ponzi scheme began, and in particular, whether it did not begin until 1992. *See id.* All of those issues will be relevant when the Trustee's

29

Two-Year Transfer claims against the Defendants are heard and determined. *See id.*

Although this is a question for another day, it is worth noting that the Trustee's theory of the case with respect to that MCI stock is that Madoff gave a "gift" of $120 million to Magnify. Madoff was a crook. He stole from others. He is not known for simply giving away substantial sums, such as $120 million, to his accountholders. *See id.*

With respect to the motion at bar, what is imperative to note is that everything alleged in ¶¶ 76-89 and 115 took place years before Green met Madoff for the first time in April 1993, (*see* Green Aff., p. 12 n. 6), and years before Green became involved with Magnify's BLMIS Accounts, which occurred after Igoin passed away in 1995. Thus, even if everything alleged by the Trustee regarding the MCI stock transactions is true, (a) Green had nothing to do therewith, (b) Green's name and address appear nowhere on the account documents included in ¶¶ 82, 85, and 86, and (c) Green never received any of those documents and had no involvement with the Magnify Accounts at that time. *See* Green Aff. ¶¶ 13, 16; Ex. E. Thus, none of those allegations serve to establish Green's "actual knowledge" of the BLMIS Ponzi scheme.

Particularly egregious is the Trustee's attempt to smear Green as a liar in ¶ 89, wherein it is alleged that "[i]ndeed, when asked by a reporter after BLMIS's fraud came to light whether YHA's losses exceeded $800 million, Green dismissed this number as 'fantastical' and stated that the amount involved was far smaller." As the Trustee knows, Green's statement was absolutely true. YHA's paper losses in its BLMIS Account were approximately $51.5 million, not $800 million, as is borne out by the Customer Claim that YHA filed with the Trustee and its final BLMIS customer statement dated 11/30/08 and annexed thereto. *See* Ex. F. Thus, Green's aforesaid statement was accurate, and it is not Green who is guilty of willfully ignoring or misstating the known facts.

30

The SAC then goes on to falsely allege in ¶ 90 that "[b]y the early-1990's, . . . [i]nstead of providing monthly customer account statements for those Accounts [the Magnify BLMIS Accounts], BLMIS began providing Green with biannual 'Portfolio Evaluations.'" This is a blatant lie. The Trustee knows from the BLMIS records in his possession that Green was not provided with any Magnify Portfolio Evaluations by BLMIS until after Igoin's death in 1995, (*see* Green Aff. ¶ 17; Exs. I, J), which is when Green first became involved with the BLMIS Accounts of Magnify. Equally false is the allegation in ¶ 91 that "Green knew what the typical BLMIS customer statements looked like because he saw the statements sent to YHA." YHA's customer statements were sent to YHA, not to Green, and Green never saw them until after the collapse of BLMIS. *See* Green Aff. ¶¶ 15, 38. The Trustee cannot substantiate his unfounded conclusory allegation that Green saw those statements. The Trustee then misleadingly alleges in ¶ 91 that "Madoff's employees personally provided these statements to Green at his meetings with Madoff." Madoff's employees never provided "these statements" (i.e., the BLMIS customer statements of YHA) to Green at his meetings with Madoff or at any other time. *See* Green Aff. ¶¶ 15, 17, 38. The only documents that were provided to Green at his meetings with Madoff were the Portfolio Evaluations for Magnify (and those for Strand and Premero after their BLMIS Accounts were opened). *See* Green Aff. ¶¶ 17, 18, 19; Exs. I, J, K, L, M.

Paragraph 92 falsely alleges that "[b]y 1993, if not earlier, Green began meeting with Madoff personally two to three times per year to discuss Magnify's (and later Premero's and Strand's) Accounts." That same false allegation is set forth in ¶¶ 62, 116, and 130. As the Trustee knows from the documentary evidence in his possession, that statement is untrue, as those meetings did not commence until after Igoin died in 1995. Prior thereto, Green had only met Madoff twice, on social occasions on April 14, 1993, and February 9, 1994. No Magnify

business was discussed at those two social meetings. *See* Green Aff., p. 12 n. 6, p. 35 n. 12.[10]

As is set forth in ¶ 93, all of Green's meetings with Madoff regarding Magnify's portfolio (and those of Strand and Premero after they were created) were documented by letters that Green sent to Madoff to set up those meetings. *See* Green Aff. ¶ 37; Ex. JJ. As the Trustee well knows, there were no such letters prior to Igoin's death in 1995. The reason for that is simple and straightforward: until he died, it was Igoin, and Igoin alone, who was in charge of Magnify's BLMIS Accounts. Green played no role in the supervision thereof. *See* Green Aff. ¶¶ 13, 16, 17, 23; Ex. E.

The fact that on rare occasions after Igoin's death Green met socially with Madoff, sometimes with their wives, during Green's visits to New York, does nothing to establish actual knowledge. The Trustee's allegation in ¶ 94 that such social occasions took place "often" is false. They only occurred on three or four occasions. *See* Green Aff., p. 12 n. 6. The balance of ¶ 94 is purely conclusory, alleging without any factual basis or support whatsoever that Green was "treated with special care by Madoff" and that "Green's special treatment . . . perplexed even BLMIS's employees."

Paragraph 97 alleges in conclusory fashion that "Green would meet behind closed doors with Madoff," but that conclusory allegation is without any basis, and is in fact false. *See* Green Aff., p. 20 n. 8. There were no such "closed door" meetings. In addition, those meetings between Green and Madoff did not take place on the infamous 17th floor of the BLMIS offices, and the

---

[10] Paragraph 133 alleges that "Green met with Madoff at least twice a year since Premero's first Account was formed in 1995 regarding Premero's portfolio," and ¶ 136 alleges that "Green met with Madoff at least twice a year since the creation of Strand's Account regarding Strand's portfolio." The Court should not be misled into believing that these meetings were separate meetings. Each one of Green's meetings with Madoff after the death of Igoin was with respect to the Accounts of Magnify, Strand, and Premero that were then in existence when those meetings were held. For the most part, those meetings occurred just twice a year and they did not last more than 1-1.5 hours each. *See* Green Aff., p. 12 n. 6, p. 35 n. 12.

590854v.5

SAC does not allege that they did. In fact, Green was never on that 17th floor. *See* Green Aff., p. 20 n. 8.

Although the SAC conclusorily and falsely alleges that "Green knew from the face of the September 1990 Magnify customer statement, [(*see* Ex. H)], that BLMIS was not trading real securities," (¶ 7), the facts are to the contrary, as Green had nothing to do with Magnify's BLMIS Accounts until after Igoin died in 1995, (s*ee* Green Aff. ¶¶ 13, 16, 17, 23; Ex. E). Green's name and address are not set forth on that September 1990 customer statement, (*see* Green Aff. ¶ 16; Ex. H), and Green never saw that September 1990 customer statement until after this adversary proceeding was commenced, (*see* Green Aff. ¶ 16). The SAC also falsely alleges that Green "was the co-founder and legal counsel of YHA and at all relevant times had *de facto* control over YHA and controlled the flow of funds into its Account," (¶ 40), when in fact Green was not a co-founder of YHA, (*see* Green Aff. ¶ 25; Ex. S), but rather served only as its attorney, and Green had no control over the flow of funds into YHA's BLMIS Account until after Igoin's death in 1995, when Green assumed operational control of Magnify. *See* Green Aff. ¶¶ 13, 16, 17, 23; Ex. E.

In ¶ 98 it is outrageously alleged, upon information and belief, that "when Madoff and Green met, they discussed the rate of return in the Magnify, Strand, and Premero Accounts, and reached or reconfirmed an agreement or understanding regarding the portfolios' promised rate of return." A similar outrageous allegation is set forth in ¶ 99, wherein it is alleged that "[t]he Portfolio Evaluations tailor-made for and reviewed by Green confirm that Green's arrangement with Madoff was for BLMIS to create an ever-increasing equity value that would be at Green's disposal." In ¶ 130 it is similarly alleged, once again upon information and belief, that "Green met with Madoff to come to an agreement or understanding regarding Magnify's rate of return,"

33

and in ¶ 133 it is alleged in identical language that "Green met with Madoff to come to an agreement or understanding regarding Premero's rate of return." Those conclusory and unfounded allegations are without any factual basis whatsoever and are completely false. They are made of whole cloth. There was no "promised" rate of return on those Accounts, and the reported rates of return on those Accounts, as evidenced by the semi-annual Portfolio Evaluations that Green received from BLMIS, (*see* Exs. I, J, K, L, M), which were the sole source of Green's knowledge about the rates of return on the BLMIS Accounts of Magnify, Strand, and Premero, were neither exorbitant nor consistent. *See* Green Aff. ¶¶ 17, 18, 19, 20, 21. In addition, in some of Green's letters to Madoff, Green expressed some concerns about the returns on the Accounts due to market conditions and volatility. *See* Ex. JJ.

Paragraph 98 also alleges untruthfully that following Green's meetings with Madoff, Madoff purportedly "often directed Green to Madoff's secretary to dictate letters requesting withdrawals or transfers from the Magnify, Strand, and Premero Accounts. At Green's request, Madoff's secretary prepared letters of instruction to BLMIS and printed these documents on Green's law firm's own letterhead." That happened only once, or possibly twice, rather than "often," and that does not in any way serve to establish actual knowledge of the Ponzi scheme. *See* Green Aff. ¶ 17.

Equally without foundation are ¶ 98's conclusory allegations that "Madoff's secretary was then instructed to delete and leave no electronic record of these letters after they were generated," and, upon information and belief, that "on at least one occasion, Green and Madoff agreed to backdate a letter typed by Madoff's secretary so that the letter would appear to pre-date their meeting." Green never gave or participated in any such instructions or conduct. *See* Green Aff. ¶ 17.

34

The SAC devotes ¶¶ 99-112 to allegations predicated upon the fact that Green received semi-annual Portfolio Evaluations for the BLMIS Accounts of Magnify, Strand, and Premero, rather than monthly customer statements with respect to those accounts. Although it is true, as alleged in ¶ 99, that during the 1990's those Portfolio Evaluations itemized a list of various stocks, and that thereafter the Portfolio Evaluations only listed U.S. Treasury Bills or Fidelity money market mutual funds, there was nothing inherently sinister about that change. As was explained to Green by Madoff, (*see* Green Aff. ¶ 38), BLMIS would periodically close out its securities positions and invest the proceeds in Treasury Bills and Fidelity money market funds. What the SAC omits is the fact that this practice, as expressed to Green by Madoff, was consistent with the way in which BLMIS reported to YHA on its portfolio. As alleged by the Trustee in ¶¶ 91 and 106, YHA did receive monthly customer statements listing the securities transactions in its Account. What the SAC fails to say is that BLMIS, through its accountants, also issued year-end confirmations as at December 31st of each year to YHA that reflected holdings at year-end that were similar to the Portfolio Evaluations that it issued to Magnify, Strand, and Premero, listing only U.S. Treasury Bills and Fidelity money market funds at the end of the reporting period covered thereby. *See* Green Aff. ¶ 38; Ex. LL. In addition, the very same practice was utilized by BLMIS with its other customers. *Kingate*, 2015 WL 47334749, at *7.

The liquidation of securities and the investment of the proceeds thereof into Treasury Bills and Fidelity money market funds was not unique to Magnify, Premero, Strand and YHA. Madoff's reported utilization of that strategy was far more widespread, as evidenced by this Court's decision in *Kingate*, wherein the Court took note of the Trustee's allegations that: "Various SEC reporting requirements are triggered when securities are invested in the market at either the end of the quarter or the end of the year. Madoff purported to liquidate all investments

35

at those times, regardless of market conditions, and invest the proceeds in Treasury Bills to evade those reporting requirements." 2015 WL 4734749, at *7.

With respect to the allegation in ¶ 100 that the Treasury Bills and money market funds could not have generated the return reflected in the Magnify, Strand, and Premero Portfolio Evaluations, as understood by Green, the increases in those Accounts arose out of the liquidation of the Treasury Bills and Fidelity funds and subsequent securities trading with the proceeds thereof until the end of the next reporting period, when the process was repeated. *See* Green Aff. ¶ 38.

In ¶ 102, the Trustee alleges that Green failed to properly perform his duties under his Fee Agreement with Magnify, (*see* Ex. EE). That allegation, even if true, does not support the Trustee's conclusory assertion that Green's purported inadequate performance "further demonstrates his knowledge that no investments were taking place." In addition, BLMIS was not a party to that Fee Agreement, and it is not the Trustee's place to assert claims based on any alleged failure to perform thereunder by Green.

Paragraphs 107, 108, 109, 111, and 112 contain allegations about the internal operations of BLMIS and do nothing to establish any actual knowledge on the part of Green, who played no role therein and was not familiar therewith. In fact, of the utmost significance is the Trustee's allegation in ¶ 108 that although "BLMIS kept track of its cash flow [in the Magnify, Strand, and Premero BLMIS Accounts] in order to perpetuate its Ponzi scheme, it did not share those records with Green." In fact, BLMIS did not share any of its internal records with Green. *See* Green Aff. ¶ 21.

The SAC also contains a multitude of false allegations accusing Green of dishonesty and self-dealing. *See* SAC ¶ 2 (alleging that "Green and several other defendants used Magnify's

36

BLMIS accounts as a fountain of 'free money'"); ¶ 5 (alleging that "[t]hrough withdrawals from the Accounts, Green pocketed several million dollars and distributed millions more to his entities and family members both directly and through bank accounts in Switzerland and Israel"); ¶ 8 (alleging that "Green also skimmed millions off the top for himself in the form of purported investment management fees, and also used certain Accounts to transfer millions of dollars to family members, other entities he controlled, and foreign investments"); ¶ 36 (alleging that "Green operated each of these entities pursuant to a fraudulent scheme in order to, among other things, obtain money and benefits for himself, and his personal and business pursuits"); ¶ 37 (alleging that "Green was the mastermind behind the operation of Magnify and Strand, which he used to pursue his own agenda, and to profit personally and professionally throughout Israel"); ¶ 38 (alleging that "[t]hrough Green's control of Magnify from at least 1989 forward, Green diverted millions of dollars to himself, his family, and other contacts, and to Swiss and Israeli bank accounts"); ¶ 61 (alleging that Green "directed transfers [from Magnify's BLMIS Accounts] to himself, his family members, and other personal interests" and "also pledged a Magnify bank account as collateral for a personal debt and held himself out to another bank as YHA's owner"); ¶ 63 (alleging that "Green also used Strand (which he represented that he beneficially owned) as collateral to obtain a mortgage to buy his daughter a home in Maryland, and used a withdrawal from Strand's BLMIS Account, to buy an apartment in Israel for a business associate"); ¶ 68 (alleging that "Green also directed transfers of fictitious profits from the Magnify Accounts to be used to the benefit of certain individuals associated with YHA, including Nahir. Beginning at least by 1992 and continuing through 1996, Green directed transfers totaling nearly $3 million from the Magnify Accounts to accounts in Israel for the benefit of Nahir and her family. At least $2.5 million of these transfers occurred after Igoin's

37

death. Beginning in 2002, Green also transferred a total of $300,000 from the Magnify Accounts to the widow of one of YHA's founding directors"); ¶ 72 (alleging that "Green withdrew approximately $15 Million from Magnify and Strand, which he directed to entities and individuals that benefited himself, his family, and others having no relationship to YHA" which "included nearly $1.5 million that Green transferred directly from Strand's Account to his children, other individuals affiliated with Green in Israel, and an investment fund in the Cayman Islands"); ¶ 73 (alleging that "Green transferred almost all of the remainder of the $15 million to bank accounts in Magnify's and Strand's names in Israel and Switzerland" and "[b]ank records show that Green made personal use of those funds, including the transfer of approximately $3 million to offshore investment funds, and hundreds of thousands of dollars to Green's daughters, his secretary and other affiliates); ¶ 74 (alleging that "between February of 1996 and May of 2000, Green [withdrew] at least $1,070,000 from the Magnify Accounts to finance Magnify's 'ongoing activities'" and "[b]ecause Magnify was a shell investment vehicle with minimal operating expenses, these withdrawals could not have been used for any such purpose"); ¶ 113 (alleging that "[a]s the main decision maker for Magnify and Strand, Green actively directed and controlled their daily activities for his benefit and advantage, including dealings with Madoff and BLMIS. The entities acted in unison to allow him the full ability to exert authority and control over their Accounts, for Green's personal benefit and for the purpose of profiting from Madoff's fraud"); ¶ 114 (alleging that "Green wrongly used Magnify, Strand and their collective assets as mere instrumentalities to further his own, and his family's, personal interests and to profit from BLMIS, which [conclusorily] Green knew was a fraud"); ¶ 116 (alleging that Green directed "millions of dollars to YHA, Green's family members, his affiliates, his offshore investment interests, and to or for the benefit of certain individuals associated with YHA, including Nahir"

38

and "Green also created and solely controlled accounts in Israel and Switzerland in Magnify's name through which he diverted fictitious profits from BLMIS for personal uses"); ¶ 117 (alleging that "[i]n 1998, Green created Strand for the sole purpose of funneling money out of BLMIS for his benefit, and the benefit of his family members, and his various offshore investment interests" and "Green opened bank accounts for Strand in Switzerland and Israel through which he diverted fictitious profits from BLMIS for personal uses"); ¶ 118 (alleging that "Green used this authority [to make investment decisions and withdraw capital] to exploit Magnify's and Strand's Accounts for his own personal gain"); ¶ 119 (alleging that "Green collected at least $3.15 million in fees under his self-serving Fee Agreement, and directed millions more in withdrawals from Magnify's Accounts to family members, and other Defendant entities, including Strand and Express" and "directed approximately $1.5 million worth of transfers from Strand's Account to various offshore destinations, including $500,000 to an investment fund in the Cayman Islands, $300,000 to his children's personal bank accounts in the United States, and $130,000 to his secretary (and the co-founder of Green's charitable foundation)"); ¶ 119 (further alleging that "Green requested the transfer of nearly $12 million of fictitious profits from Magnify's and Strand's Accounts to those entities' Credit Suisse accounts"); ¶ 120 (alleging that "Green used Magnify's account at Bank Hapoalim as collateral for a personal debt" and "held himself out as Strand's owner, including representing to HSBC that he was Strand's beneficial owner in order to obtain a mortgage to buy his daughter a home in Maryland" and "also used a withdrawal from Strand's Account to buy an apartment in Israel for one of his business associates").

Those allegations, even if completely true (which Green vehemently denies), do nothing more than call into question Green's honesty and integrity. However, it is indisputable that none

39

of those allegations serve to plausibly allege that Green had actual knowledge that BLMIS was operating a Ponzi scheme and was not actually trading securities. In addition, as is demonstrated in Green's moving affidavit and the exhibits annexed thereto, the various transactions that the SAC refers to for purposes of impugning Green's character were legitimate and, where appropriate, were duly authorized by the proper people, such as Albert Igoin and Doris Igoin with respect to Magnify and Strand and Shimon Katz, as the beneficiary of the Trust that owns Premero.[11] Green vehemently denies the Trustee's false allegations, which are repetitively alleged throughout the SAC in order to besmirch Green's character. The constant repetition of the same false allegations does not make them true. A lie remains a lie no matter how many times it is repeated.  But again, such allegations, even if true, do not plausibly allege actual knowledge.

The SAC discusses Green's Fee Agreement with Magnify at some length in ¶¶ 69-71 and 116. What is omitted therefrom is the fact that prior to his death Igoin authorized that fee arrangement and the fact that Green discussed that fee arrangement with Kurt Brunner ("Brunner"), the Swiss attorney who was the sole Director of Magnify, and Brunner found it to be a reasonable arrangement. *See* Green Aff. ¶ 34; Exs. E, EE, FF, GG. With respect to the $3.15 million payment made to Green in 2002 pursuant to that Fee Agreement, that was for Green's services from 1995 to 2002, a 7-8 year period. *See* Green Aff. ¶ 34; Exs. E, EE, FF, GG. In addition, as with all of the other allegations accusing Green of dishonesty and self-dealing,

---

[11] As is set forth in Green's moving affidavit and substantiated by the exhibits annexed thereto, (a) the transfers to members of the Nahir family were authorized by Albert Igoin before he died and by Doris Igoin thereafter, (b) the transfers to the family of Yitzhak Amir, a founding director of YHA, were authorized by Albert Igoin before his death and by Doris Igoin thereafter, (c) Premero's offshore investment with the Book Defendants was authorized by Shimon Katz of the Trust that owns Premero, (d) the offshore investments made by Strand were made for Strand's benefit and not for the benefit of Green, (e) Green never held himself out as Strand's beneficial owner in order to obtain a mortgage to buy his daughter a home in Maryland, when in fact she never purchased any such home. *See* Green Aff. ¶¶ 6 n.4, 29C, 31, 32, 33, 36, 39 n. 13; Exs. Y, CC, DD, HH, II.

40

none of the Trustee's allegations regarding the Fee Agreement plausibly allege that Green had actual knowledge of the BLMIS Ponzi scheme and that BLMIS was not actually trading securities.

The SAC also contains allegations that are inherently inconsistent and in fact completely contradictory. In ¶ 9, in discussing Magnify's BLMIS accounts, it is falsely alleged that BLMIS employees "would create draft Portfolio Evaluations in preparation for Green's meeting with Madoff, and they would only be finalized after Green met with Madoff and BLMIS employee Frank DiPascali," and it is similarly falsely alleged in ¶ 95 that "[b]y the mid-1990's, during his regular meetings with Madoff, Green participated in the preparation and revision of the Portfolio Evaluations . . . for Magnify, Strand and Premero," whereas in ¶ 95 it is then alleged, correctly, that it was only "[t]he Portfolio Evaluations for Premero [that] were stamped 'draft' until after Green's review." The explanation for that fact is set forth in the Green Aff. at ¶¶ 20 and 21 and substantiated by Exhibits L, M, N, and O annexed thereto, and is further substantiated by (a) ¶ 97, wherein it is alleged that "certain of the Portfolio Evaluations . . . [i]n particular . . . the . . . holdings for Premero's two Accounts were aggregated on a single draft Portfolio Evaluation" and "DiPascali would exit the meeting with Green and arrange for the single evaluation to be split into two separate Portfolio Evaluations, dividing the . . . holdings between Premero's two Accounts according to directions from Green and/or Magnify at the meeting," (b) ¶ 110, alleging that "multiple deposits intended for the Premero II Account were instead credited by BLMIS to the Premero I Account and never corrected," and (c) ¶ 133, which alleges that "Green reviewed the Portfolio Evaluations for Premero's Accounts, which were addressed to him and hand delivered by Madoff during Green's visits to BLMIS. Green met with Madoff to come to an agreement or understanding regarding Premero's rate of return, directed inter-account transfers

41

and withdrawals from Premero's Accounts, and autonomously divided Premero's BLMIS holdings amongst its two accounts during his closed-door meetings with Madoff." What the SAC omits is any mention of the fact that all of the instructions as to deposits into and withdrawals from the two Premero accounts were evidenced by letters that Green had previously sent to BLMIS in real time, (*see* Exs. N, O), and that the allocations made by Green during those meetings (which, as aforesaid, were not closed door meetings) were done for purposes of conforming the two Premero accounts to the prior written instructions that Green had issued to BLMIS with respect to those accounts, and had nothing to do with an agreement or understanding regarding Premero's rate of return, as there was no such agreement or understanding. *See* Green Aff. ¶¶ 20, 21.

In ¶ 31 it is alleged that with the exception of the BLMIS account of YHA, "the other Magnify-related Accounts engaged in no consistent strategy throughout the 1980's, and abandoned any trading strategy whatsoever in the 1990's." However, the fact of the matter is that none of the BLMIS Accounts of the Accountholder Defendants other than the first BLMIS Account of Magnify even existed "throughout the 1980's," and the SAC correctly alleges in ¶ 44 thereof that YHA's Account was opened in 1989, the second Magnify Account was opened in 1990, the two Premero Accounts were opened in 1995 and 1996, and the Strand Account was opened in 1999. In ¶ 58 it is alleged that "[f]rom the time Magnify's shares were transferred to YHA in 1989, Green exercised full control over Magnify, which was the sole funding source for YHA. Thus, . . . it was Green who controlled the purse strings." Despite that false allegation, in ¶¶ 65-67, it is then alleged that after Igoin's death in 1995, the "volume and magnitude" of the transfers from Magnify's BLMIS Accounts to YHA's BLMIS Account "dramatically escalated." The contradiction is glaring. If Green controlled Magnify's purse strings from 1989 onward, why

42

is it that the transfers from Magnify to YHA "dramatically increased" after Igoin's death? The Trustee's inconsistent assertions make no sense. The only plausible explanation is that Green did not take over control of Magnify until after Igoin passed away in 1995.

The allegations against Green in this matter pale in comparison to both the allegations that the Court found insufficient to sustain a pleading of "actual knowledge" and the allegations that the Court found sufficient to uphold such a claim at the pleading stage in the six cases discussed above.

## POINT II

**THE TRUSTEE'S INTENTIONAL TWO-YEAR FRAUDULENT TRANSFER CLAIM AGAINST PREMERO PURSUANT TO BANKRUPTCY CODE § 548(a)(1)(A) MUST BE DISMISSED; SAID CLAIM SEEKS TO RECOVER PRINCIPAL, RATHER THAN FICTITIOUS PROFITS, AND PREMERO HAS A VALID DEFENSE THERETO UNDER BANKRUPTCY CODE § 548(c)**

Count One of the SAC sets forth the Trustee's two-year intentional fraudulent transfer claims under § 548(a)(1)(A) of the Bankruptcy Code. Pursuant to § 548(c) of the Bankruptcy Code, if a transferee "takes for value and in good faith," that is an absolute defense to a § 548(a)(1)(A) claim. *Merkin*, 515 B.R. at 138; *Legacy*, 548 B.R. at 28; *Avellino*, 557 B.R. at 112; *Mendelow*, 560 B.R. at 225; *Shapiro*, 542 B.R. at 112.

As is indicated in both Exhibit A and Exhibit B to the SAC, the Trustee is seeking to recover the sum of $1,468,902 as a Two-Year Transfer of principal from Premero's Account No. 1FN073. Although the Trustee also initially sought to recover the sum of $1,031,098 in fictitious profits from that account as a part of a Two-Year Transfer in the total sum of $2,500,000, that fictitious profits portion of the Trustee's claim was settled by Premero's payment in full of $1,031,098 to the Trustee pursuant to a settlement agreement by, between, and among the Trustee, Premero, and the two former defendants Robert H. Book and R.H. Book LLC. The settlement of the fictitious profits portion of that Two-Year Transfer claim is admitted in the

43

SAC. *See* SAC ¶ 148 n.7. Thus, all that remains of the Trustee's Two-Year Transfer claim against Premero is the claim to recover Premero's principal of $1,468,902, which was the other part of Premero's $2,500,000 payment to the Book former defendants.

As noted by this Court in *Merkin*:

> The "good faith" issue is not implicated when the Trustee seeks to recover net profits. Even if the transfer was received in "good faith," the transferee did not give value for the transfer of net profits, and cannot, therefore avail himself of the good faith defense. *See Katz*, 462 B.R. at 455-56. The "good faith" issue is, however, implicated where, as here, the Trustee seeks to recover the repayment of principal to the transferee because the transferee gave value to the extent it deposited cash with BLMIS.

*Merkin*, 515 B.R. at 138-39.

Following a withdrawal of the reference to determine the standard for the Trustee to show that a defendant did not receive transfers in good faith under, *inter alia*, Section 548(c), the District Court held that "in a SIPA proceeding such as this, a defendant may succeed on a motion to dismiss by showing that the complaint does not plausibly allege that that defendant did not act in good faith." *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 516 B.R. 18, 24 (S.D.N.Y. 2014) (the "*Good Faith Decision*"). Under the *Good Faith Decision*, to avoid and recover initial transfers under, *inter alia*, Section 548(a), the Trustee bears the burden of pleading in his complaint "particularized allegations that the defendants here either knew of Madoff Securities' fraud or willfully blinded themselves to it." *Id.* Thus, the *Good Faith Decision* clarified that, unlike "in the context of an ordinary bankruptcy proceeding," (*id.*), where "'good faith' appears to be an affirmative defense that must in the first instance be pleaded by defendants," (*id.* at 23), "in a SIPA proceeding such as this," the burden of pleading lack of good faith rests with the Trustee. *Id.* at 24.

Insofar as the Trustee's claim to recover Premero's principal as a Two-Year Transfer is

concerned, this Court has repeatedly held:

> Where, as here, the Trustee seeks to recover the transfer of principal in addition to fictitious profits, he must plead the transferee's lack of subjective good faith, which, in this SIPA case, means the transferee turned a blind eye to facts that suggested a high probability of fraud. *Katz*, 462 B.R. at 454-56; *SIPC v. BLMIS (In re BLMIS)*, 516 B.R. 18, 21 (S.D.N.Y. 2014) ("*Good Faith Decision*"); *Picard v. Ceretti (In re BLMIS)*, Adv. P. No. 09-01161, 2015 WL 4734749, at *12 (Bankr. S.D.N.Y. Aug. 11, 2015) ("*Kingate*"), *leave to appeal denied*, 15 Civ. 7086(JPO) (S.D.N.Y. Dec. 4, 2015); *Picard v. Merkin (In Re BLMIS)*, 515 B.R. 117, 138-39 (Bankr. S.D.N.Y. 2014) ("*Merkin*"). Lack of objective good faith is not enough "because the securities laws do not ordinarily impose any duty on investors to investigate their brokers, and those laws foreclose any interpretation of 'good faith' that creates liability for a negligent failure to so inquire." *Picard v. Avellino*, 469 B.R. 408, 412 (S.D.N.Y. 2012); *accord Katz*, 462 B.R. at 455.

> In summary, in order to meet his pleading burden . . . , the Trustee must plead that the initial transferee had actual knowledge that BLMIS was not engaged in the trading of securities. If the [complaint] does not plead actual knowledge, the Trustee can still recover intentional fraudulent transfers, including transfers of principal, pursuant to 11 U.S.C. § 548(a)(1)(A) . . . if he pleads that the initial transferee willfully blinded itself to the fact that BLMIS was not engaged in the actual trading of securities. If the Trustee does not plead actual knowledge or willful blindness, his recovery under 11 U.S.C. § 548(a)(1)(A) is limited to any fictitious profits transferred to the initial transferee.

*Avellino*, 557 B.R. at 112-13. *See also Legacy*, 548 B.R. at 28-29; *Shapiro*, 542 B.R. at 112;

*Kingate*, 2015 WL 4734749 at *12.

With respect to the issue of "willful blindness," after noting that "[t]he line between 'actual knowledge' and 'willful blindness' is difficult to draw," this Court found that:

> "Willful blindness" . . . involves two elements: "(1) the defendant must subjectively believe that there is a *high probability* that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." *Global-Tech Appliances, Inc. v. SEB S.A.*, ----- U.S. ----, 131 S.Ct. 2060, 2070, 179 L.Ed.2d 1167 (2011) (emphasis added). . . . Thus, willful blindness connotes strong suspicion, but *some* level of doubt or uncertainty of the existence of a fact and the deliberate failure to acquire actual knowledge of its existence.

*Merkin*, 515 B.R. at 139-40 (emphasis in original). *See also Kingate*, 2015 WL 4734749 at *13.

45

The SAC does not contain a single allegation that Premero itself had actual knowledge of the BLMIS Ponzi scheme. Rather, the SAC seeks to impute Green's alleged actual knowledge to Premero. As it has been demonstrated in Point I, *supra*, that the SAC fails to adequately allege that Green had actual knowledge of the BLMIS Ponzi scheme, that ends the inquiry on that issue, and all that remains is the issue of willful blindness.

Similarly, there is not a single allegation in the SAC that Premero willfully blinded itself to the BLMIS Ponzi scheme. In addition, the SAC makes no attempt to allege factually that Green willfully blinded himself to the fact that BLMIS was not actually engaged in the trading of securities. Thus, there are no allegations as to the willful blindness of Green that could be imputed to Premero even if such imputation was warranted, which is not the case.

On the issue of "willful blindness," this Court has discussed the significance of "red flags" alerting someone to the probable existence of a fraud and the willful disregard of those warnings, as follows:

> If a person who is not under an independent duty to investigate "nonetheless, intentionally chooses to blind himself to the 'red flags' that suggest a high probability of fraud, his 'willful blindness' to the truth is tantamount to a lack of good faith." *Katz*, 462 B.R. at 455; *see United States v. Tusaneza*, 116 Fed.Appx. 305, 306 (2d Cir. 2004) ("'Willful blindness' may be inferred from the presence of a pattern of 'red flags' putting defendant on notice of the illegal source of the funds."), *cert. denied*, 546 U.S. 874, 126 S.Ct. 383, 163 L.Ed.2d 169 (2005).

*Merkin*, 515 B.R. at 139-40.

This Court dealt with the issue of red flags and "willful blindness" in both *Merkin* and in *Picard v. Merkin (In re BLMIS)*, 563 B.R. 737 (Bankr. S.D.N.Y. 2017) ("*Merkin II*"). *Merkin* involved a motion to dismiss at the pleading stage, and after the denial thereof on the issue of "willful blindness," *Merkin II* dealt with that same issue on a motion for summary judgement. In *Merkin II,* the Court noted that as it had previously found in *Merkin* that the Trustee had failed to

46

plead "actual knowledge," the only remaining inquiry on the Trustee's intentional fraudulent transfer claim was whether Merkin had willfully blinded himself to the BLMIS fraud, noting:

> The willful blindness inquiry asks whether an individual took deliberate action to avoid confirming a fact *after* learning that there was a high probability that such fact was true.

*Merkin II*, 563 B.R. at 749 (citations omitted) (emphasis in original).

In both *Merkin* and *Merkin II*, the Court discussed a multitude of "red flags" that were alleged in the complaint and gave rise to issues of fact warranting denial of the motions for dismissal of the intentional fraudulent transfer claims. The Court pointed out that the analysis was a two-pronged process, involving (1) whether the defendant suspected fraud at BLMIS, and (2) whether the defendant then suppressed his own suspicions and intentionally chose not to investigate further. With respect to Merkin, the court found that the "red flags" amounted to "evidence that Merkin learned about the possibility of fraud at BLMIS and also voiced his own concerns" about that possibility, (*Merkin II*, 563 B.R. at 745), and "evidence supporting the inference that Merkin consciously avoided confirming his suspicions about BLMIS' fraudulent operations," (*Id.* at 748). Those "red flags" consisted, *inter alia*, of the following:

A. Merkin was cautioned about Madoff by another person as early as 1992;

B. A person who Merkin encouraged to invest with BLMIS did so in or about 1992, but then redeemed his investment by the end of 1995 because Madoff's ability to achieve consistently positive returns "belied logic" and made him "very uncomfortable," all of which he discussed with Merkin on many occasions, opining repeatedly that it was "almost impossible" for Madoff to achieve such returns;

C. Merkin was aware that BLMIS employed Friehling & Horowitz, a small accounting firm with one active accountant, as its auditor;

D. Documents in a "Madoff File" maintained by Merkin raised suspicions of fraud at BLMIS;

E. Although initially Merkin raised the issues of transparency and scalability with Madoff, he never got satisfactory answers to his questions and then gave up asking;

47

F. Merkin himself questioned BLMIS' uncanny consistency, and when he raised that issue with Madoff, he got no answer;

G. Merkin questioned Madoff's unusual fee structure, raised that issue with Madoff, and again got no answer;

H. Merkin expressed his concerns about Madoff to representatives of a research firm engaged to perform ongoing due diligence regarding BLMIS;

I. The research company to whom Merkin expressed his concerns about BLMIS concluded that there seemed to be some probability even in Merkin's mind that BLMIS could be a fraud, as he lacked and could not obtain good explanations for his questions about BLMIS and had simply "come to accept" that there were "things that he didn't understand" about BLMIS;

J. Merkin advised others never to "go long in a big way" in a BLMIS investment;

K. After the Bayou Group scandal broke and it was exposed as a Ponzi scheme, Merkin circulated an email setting forth "red flag" issues to be asked of his funds' money managers, and although Merkin knew that several of the red flags he had identified applied to BLMIS, he never did anything to confirm that BLMIS was a legitimate operation and not a Ponzi scheme like the Bayou Group;

L. Merkin admitted that he stopped asking Madoff any questions;

M. Merkin advised others to avoid asking Madoff questions.

*Merkin II*, 563 B.R. at 745-48. In *Merkin*, the Court referred to allegations that Merkin saw such "red flags" as (1) Madoff's records of option trades and that their prices were contradicted by publicly available information, (2) Madoff provided "dubious and shifting explanations of how his business operated," (3) there was a possibility that Madoff was using client money to fund his separate market-money business, (4) Madoff's trades could not be independently verified due to his practice of "self-clearing," (5) Madoff used a small accounting firm without an established reputation, (6) the known secrecy of Madoff's operations run by a small circle of family members, (7) the lack of an independent broker or custodian, (8) Madoff's unwillingness to provide electronic records of trade confirmations, (9) Madoff's use of delayed paper confirmations that allowed for the falsification of trades, (10) the "uncanny consistency and outsize implausibility" of BLMIS' returns, and (11) the facially fraudulent trade confirmations

48

that showed transactions outside the actual trading range and trades completed on days when the markets were closed. *Merkin*, 515 at 144-45.

In *Merkin*, the Court also discussed what was necessary to sustain the "red flag" theory of *scienter* at the pleading stage, noting that said theory "will be rejected where the complaint fails to allege specific facts indicating that the defendant was aware of the red flags." *Merkin*, 515 B.R. at 144. (citations omitted). The Court further noted that the "red flag" theory of *scienter* is routinely rejected where (a) the plaintiff offers no allegations or evidence that the defendant was actually aware of most of the red flags, including those that were publicly available, and (b) those that the defendant was aware of were not so serious as to infer intent to defraud. *See Merkin*, 515 B.R. at 144. With respect to Merkin, the Court then found that the Trustee's complaint was sufficient because:

> The [complaint] does not allege that Merkin missed the "red flags" or would have or should have seen them if he had looked. Instead, it avers that he saw them, understood them and purposely ignored them. Where the complaint alleges facts showing that the defendant was aware of the "red flags" and the probability that Madoff was running a fraudulent scheme, it sufficiently pleads *scienter*.

*Merkin*, 515 B.R. at 144.

> Furthermore, the fact that the Government and other investors missed the same red flags does not mean that Merkin did too. Although an investor is not under a duty to investigate his broker, *see Avellino*, 469 B.R. at 412; *Katz*, 462 B.R. at 455, Merkin was not a mere investor; he was a general partner or officer of [BLMIS feeder funds], and owed a separate duty of care in selecting their outside money-managers and their investments. . . . In short, the visibility of "red flags" depends on who is standing sentry, and Merkin agreed to keep a sharp lookout for fraud.

*Id.* at 145.

Those "red flags" caused this Court to conclude that the complaint plausibly alleged that "Merkin was aware of facts that raised a high probability that BLMIS was a fraudulent operation" and "that Merkin took deliberate actions to avoid learning the truth about BLMIS,"

49

(*Merkin*, 515 B.R. at 141), and that "the evidence supports the inference that Merkin strongly suspected that Madoff was running a Ponzi scheme based upon what he learned, what he was told and what he said. . . . Despite the knowledge that Madoff was likely operating a fraudulent enterprise, the evidence supports the inference that Merkin did nothing to allay his suspicions. . . . [T]he Trustee has adduced evidence supporting the inference that Merkin was aware of the high probability that BLMIS was a Ponzi scheme and turned his back." *Merkin II*, 563 B.R. at 749-51.

With respect to this case, there is absolutely no mention anywhere in the SAC of "willful blindness" or of any "red flags" that could conceivably have given rise to sufficient suspicions about BLMIS to cause either Premero or Green to willfully blind themselves to the fraudulent Ponzi scheme. In fact, those words do not appear anywhere in the SAC. Thus, the total absence of any allegations of either "willful blindness" or "red flags" in the SAC means that nowhere therein are there any factual allegations that plausibly allege that Premero willfully blinded itself to the BLMIS fraud or that there was any willful blindness on the part of Green that could be imputed to Premero. Therefore, the Trustee's attempt to recover Premero's principal as a Two-Year Transfer fails as a matter of law.

In addition, Green was at all times, and is, a practicing attorney. *See* Green Aff. ¶ 3. He is not a financial advisor, a money manager, a securities broker or trader, or a financial professional of any sort. *See id.* His area of expertise does not extend to such fields, and he cannot be held to the same high standard as Merkin insofar as "red flags" are concerned.

Finally, the allegations regarding imputation with respect to Premero, (*see* SAC ¶¶ 132-34), are completely conclusory and devoid of factual support. They lack factual support because they are untrue. Green was (and is) Premero's attorney. *See* Green Aff. ¶ 26. He did not own

50

Premero. *See id.* He acted on Premero's behalf as its attorney, in accordance with his client's instructions. *See id.* None of his activities on behalf of Premero as its attorney constitute grounds for the imputation of Green's alleged "bad faith" to his client.

## POINT III

### THE TRUSTEE'S ALTER EGO/PIERCING THE CORPORATE VEIL ALLEGATIONS ARE DEVOID OF MERIT; AS A RESULT, THE FIRST COUNT MUST BE DISMISSED AS AGAINST GREEN

**A.    Pleading Standard for Alter Ego/Piercing the Corporate Veil Allegations**

Courts in the Second Circuit have described the proper pleading standard for piercing the corporate veil as a "knotty question." *Apex Mar. Co., Inc. v. OHM Enters., Inc.*, No. 10-cv-8119, 2011 WL 1226377, at *2 (S.D.N.Y. Mar. 31, 2011) (internal quotation marks and citation omitted).  Where the plaintiff's veil piercing allegations are premised on harm other than fraud, the "liberal notice pleading standard of Rule 8(a) applies." *Id.* (internal quotation marks and citation omitted).  However, where a "veil-piercing claim is based on allegations of fraud, the heightened pleading standard of Rule 9(b) is the lens through which those allegations must be examined." *P.A.C. Consolidators Ltd v. United Cargo Sys. Inc.*, No. 10-cv-1981, 2011 WL 3099887, at *5 (E.D.N.Y. July 25, 2011) (internal quotation marks and citations omitted).

Regardless of the standard that applies, "purely conclusory allegations" will not suffice. *Apace Commc'ns, Ltd. v. Burke*, 522 F.Supp.2d 509, 521 (W.D.N.Y. 2007) (internal quotation marks and citation omitted).  *See also Care Envtl. Corp. v. M2 Techs., Inc.*, No. 05-cv-1600, 2006 WL 148913, at *13 n.13 (E.D.N.Y. Jan. 18, 2006) ("However, I need not decide which standard applies in this case because plaintiff's conclusory allegations fail to meet even the more lenient 8(a) standard.").

590854v.5

**B.**     **Law Applicable to the Trustee's Alter Ego/Piercing the Corporate Veil Allegations**

In bankruptcy avoidance actions, state law governs a plaintiff's alter ego/piercing the corporate veil allegations. *See, e.g., Avellino*, 557 B.R. at 122. Thus, initially, the Court must decide which state law applies to such allegations. In order to make this determination, the Court "must employ a choice-of-law analysis." *Jonas v. Estate of Leven*, 116 F.Supp.3d 314, 330 (S.D.N.Y. 2015). "Generally courts in the Second Circuit have applied the choice of law principles of the forum state, New York in this case, in order to determine which state's law governs a veil piercing claim." *Pereira v. Grecogas Ltd. (In re Saba Enters., Inc.)*, 421 B.R. 626, 648 (Bankr. S.D.N.Y. 2009). Moreover, the Second Circuit has held that "bankruptcy courts adjudicating state law claims such as a corporate veil piercing claim should apply the choice of law rules of the forum state, absent federal policy concerns." *Id.* (*citing Bianco v. Erkins (In re Gaston & Snow)*, 243 F.3d 599, 601-02 (2d Cir. 2001)); *see also In re Tyson*, 433 B.R. 68, 97 (S.D.N.Y. 2010) ("In the absence of any significant federal bankruptcy policy, a bankruptcy court applies the choice-of-law rules of the forum state.").

"Under New York's choice of law rules, the state of incorporation determines whether the corporate veil can be pierced." *Avellino*, 557 B.R. at 122. *See also Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) ("The district court correctly noted that 'under New York choice of law principles, the law of the state of incorporation determines when the corporate form will be disregarded and liability will be imposed on shareholders.'") (citations omitted); *Grecogas Ltd.*, 421 B.R. at 648 ("Under New York choice of law principles, the law of the state of incorporation of the corporation subject to potential veil piercing would govern the claim."); *Panam Mgmt. Grp., Inc. v. Pena*, No. 08-cv-2258, 2011 WL 3423338, at *3 (E.D.N.Y. Aug. 4, 2011) (same); *Jonas*, 116 F.Supp.3d at 330 (same).

52

In this case, the Trustee seeks to pierce the corporate veils of Magnify and Strand in order to hold Green personally liable for the liabilities of those two entities. As the SAC correctly alleges, Magnify is a company incorporated under the laws of Panama, (*see* SAC ¶ 38), while Strand is a company formed under the laws of the British Virgin Islands, (*see* SAC ¶ 42). Thus, Panama law governs the Trustee's alter ego/piercing the corporate veil allegations with respect to Magnify, while British Virgin Islands law governs the Trustee's same allegations regarding Strand.

### C.    Standard for Determining Foreign Law

"Appellate courts, as well as trial courts, may find and apply foreign law." *In re Tyson*, 433 B.R. at 78 (internal quotation marks and citations omitted). Although a court may "enlist the parties in the effort to determine foreign law, ultimately, the responsibility for correctly identifying and applying foreign law rests with the court." *Id.* (internal quotation marks and citation omitted). The court's determination of foreign law "must be treated as a ruling on a question of law." *In re Tyson*, 433 B.R. at 79 (internal quotation marks and citation omitted).

The Second Circuit Court of Appeals has "urged district courts to invoke the flexible provisions of Rule 44.1 to determine issues relating to the law of foreign nations." *Skanga Energy & Marine Ltd. Arevenca, S.A.*, No 11-cv-4296, 2014 WL 3928704, at *8 (S.D.N.Y. Aug. 12, 2014) (internal quotation marks and citation omitted). Pursuant to that rule, a court may "consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." *Fed.R.Civ.P.* 44.1.[12] Moreover, courts

---

[12] *Fed.R.Civ.P.* 44.1 also requires a party "who intends to raise an issue about a foreign country's law to "give notice by a pleading or other writing." *Fed.R.Civ.P.* 44.1. By asserting Panama and British Virgin Islands law in their motion to dismiss, Defendants have complied with Rule 44.1. *See, e.g., Future Indus. of Am., Inc. v. Advanced UV Light GMBH*, No. 09-cv-00966, 2010 WL 7865077, at *5 n.2 (D. Conn. Sept. 1, 2010) ("By asserting in its Motion to Dismiss that German law applies to the question of whether the forum-selection clause is mandatory or

53

"may conduct their own independent research to determine foreign law." *Panam Mgmt. Grp.*, 2011 WL 3423338, at *4 (internal quotation marks and citations omitted). They may also rely on the decisions of other courts in making such a determination. *See Jonas*, 116 F.Supp.3d at 330; *Panam Mgmt. Grp.*, 2011 WL 3423338, at *4. While oral or written testimony from expert witnesses may be admitted to prove foreign law, such testimony is not necessary. *See Jonas*, 116 F.Supp.3d at 330; *In re Tyson*, 433 B.R. at 78-79 ("The parties have not offered expert testimony concerning the content of English law at any point during the instant litigation, nor were they required to do so.").[13]

### D.   British Virgin Islands and Panama Law on Alter Ego/Piercing the Corporate Veil Allegations

#### 1.   British Virgin Islands Law

Because Strand is a company formed under the laws of the British Virgin Islands, the question of whether its veil should be pierced is one of English law. *See, e.g., Int'l Equity Invs., Inc. v. Opportunity Equity Partners, Ltd.*, 475 F.Supp.2d 456, 458, 460-61 (S.D.N.Y. 2007).

In *In re Tyson*, the court surveyed English law on when a court will pierce the corporate veil and its general conclusions regarding the same have since guided courts in this and other circuits. Under English law, the corporate veil "may be pierced only in extremely limited circumstances." 433 B.R. at 80 (internal quotation marks and citation omitted). Unlike

---

permissive, [the defendant] has complied with Rule 44.1 of the Federal Rules of Civil Procedure."); *Kolb v. ACRA Control, Ltd.*, 21 F.Supp.3d 515, 527-28 (D. Md. 2014) (defendants' assertion in their motion to dismiss that the plaintiff must assert claims in Ireland pursuant to Irish law put the plaintiff and the court on notice that the defendants believed that Irish law applied and no more formal notice was necessary pursuant to *Fed.R.Civ.P.* 44.1); *Krish v. Balasubramaniam*, No. 06-cv-01030, 2006 WL 2884794, at *3 (E.D. Cal. Oct. 10, 2006) (by raising the issue of foreign law in its motion to dismiss, the defendant satisfied the requirements of *Fed.R.Civ.P.* 44.1). *Cf. Bristol-Myers Squibb Co. v. Matrix Labs. Ltd.*, 655 F. App'x 9, 12-13 (2d Cir. 2016) (plaintiff's brief in opposition to motion to dismiss easily satisfied Rule 44.1's notice requirement as it alerted the defendant to the plaintiff's intention to invoke Indian law and was timely as the defendant had ample opportunity to respond to the plaintiff's invocation of Indian law in its reply to the plaintiff's opposition to the motion to dismiss).

[13] In fact, several courts have cautioned against undue reliance on the testimony of experts in determining foreign law. *See In re Tyson*, 433 B.R. at 78-79 n.15.

54

American law, English law does "not provide an enumerated set of factors that a court can evaluate in deciding whether to lift the corporate veil." *Id.* at 81 (internal quotation marks and citation omitted). *See also United Trade Assocs. Ltd. v. Dickens & Matson (USA) Ltd., Inc.*, 848 F.Supp. 751, 760 (E.D. Mich. 1994) (same). Nevertheless, the *Tyson* court was able to distill English law on the subject into five specific rules, three of which provide concrete guidelines for whether a party has pled sufficient piercing the corporate veil/alter ego allegations to survive a motion to dismiss.

First, the fact that a person engages in the carrying on of a business "using a duly incorporated, yet seemingly artificial, entity is not sufficient to justify piercing that entity's veil." *In re Tyson*, 433 B.R. at 86. *See also FR 8 Singapore Pte. Ltd. v. Albacore Mar. Inc.*, 794 F.Supp.2d 449, 459 (S.D.N.Y. 2011) ("[O]wnership and control of a company are not of themselves sufficient to justify piercing the veil.") (internal quotation marks and citation omitted). "Legal formalisms must be respected even at the risk of abiding a seeming injustice: 'Save in cases which turn on the wording of particular statutes or contracts, the court is not free to disregard the principle of *Salomon* merely because it considers that justice so requires.'" *In re Tyson*, 433 B.R. at 86 (citations omitted). "Likewise, courts may no longer have regard to 'the realities of the situation' in an attempt to align the law with economic circumstances." *Id.* (citation omitted). Accordingly, piercing the corporate veil is "quite rare under English law." *Id.* The "reported cases in any context where the claim has succeeded are few in number and striking on their facts." *Id.* (internal quotation marks and citation omitted); *see also FR 8 Singapore Pte. Ltd.*, 794 F.Supp.2d at 459 ("English courts will pierce the corporate veil in limited circumstances.").

Second, courts may "pierce the corporate veil only where special circumstances exist

55

indicating that [the company] is a mere façade concealing the true facts." *In re Tyson*, 433 B.R.

at 87 (internal quotation marks and citation omitted).  In interpreting this principle, courts have

required "an element of impropriety or dishonestly" to pierce the corporate veil, which may be

satisfied by evidence of the defendant's subjective intent to defraud.  *Id.* (internal quotation

marks and citation omitted).

> Nevertheless, although evidence of impropriety is necessary, it is not in itself
> sufficient to justify veil piercing. . . . For example, the fact that a "façade"
> company has breached a contract is not, in itself, dispositive of the veil-piercing
> inquiry.  Instead, "the court is entitled to 'pierce the corporate veil' and hold liable
> the individuals in control of it only if the company was used as a device or facade
> to conceal the true facts thereby avoiding or concealing any liability of those
> individuals." *Trustor* has subsequently been interpreted to mean that "the
> impropriety must be linked to the use of the company structure to avoid or
> conceal liability." "It follows from all this that if the court is to pierce the veil it
> is necessary to show *both* control of the company by the wrongdoer(s) *and*
> impropriety, that is, (mis)use of the company by them as a device or facade to
> conceal their wrongdoing."  Moreover, the court may pierce the veil "only so far
> as is necessary to provide a remedy for the particular wrong which those
> controlling the company have done."

*Id.* (citations omitted). *See also In re Optimal U.S. Litig.*, No. 10-cv-4095, 2011 WL 4908745, at

*3 (S.D.N.Y. Oct. 14, 2011) (quoting same language from *In re Tyson*); *FR 8 Singapore Pte.*

*Ltd.*, 794 F.Supp.2d at 460 (same).

Third, English law imposes a temporal requirement concerning when the misuse must

occur.  "[W]here a corporate structure is interposed for the purpose of shielding a defendant from

liability to the plaintiff or other third parties, the plaintiff's ability to recover from the defendant

on a veil-piercing theory turns on whether the defendant had already incurred some liability to

the plaintiff at the time he interposed the corporate structure." *In re Tyson*, 433 B.R. at 88. As

the court in *Tyson* explained it:

> In *Adams*, a corporate structure that was "clearly a facade in the relevant sense"
> was nevertheless not able to be pierced because "there was nothing illegal as such
> in the parent corporation arranging its affairs" to avail itself of the *Salomon*

56

principle in order to shield itself from contingent further liabilities. *Adams* thus drew a clear distinction between a defendant using a corporate structure to "evade such rights of relief against him as third parties already possess"—conduct for which veil-piercing may apply—and a defendant using a corporate structure to evade "such rights of relief as third parties may in the future acquire"—conduct which, good or bad, was thought "inherent in our corporate law." Indeed, the court in *Hashem* observed:

> The common theme running through all the cases in which the court has been willing to pierce the veil is that the company was being used by its controller in an attempt to immunize himself from liability for some wrongdoing which existed entirely *dehors*[,] i.e., outside or irrespective of the company. It is therefore necessary to identify the relevant wrongdoing—in *Gilford* and *Jones v. Lipman* it was a breach of contract which, itself, had nothing to do with the company, in *Gencor . . . and *Trustor* it was a misappropriation of someone else's money which again, in itself, had nothing to do with the company—before proceeding to demonstrate the wrongful misuse or involvement of the corporate structure.

Other recent veil-piercing cases have reached the same conclusion as *Hashem* in this respect. In *Kensington,* the High Court stated that "the corporate structure could legitimately be used" to limit "the legal liability (if any) in respect of particular *future* activities," while "transactions or structures, which have no legal substance, and which are set up with a view to defeating *existing* claims of creditors can, if they are purely a sham and a façade, be treated by the court as lacking validity." Indeed, the *Kensington* court's decision to pierce the veil expressly depended on a finding that "unlike *Adams,* the liabilities of the defendant are not future potential liabilities but existing liabilities under extant judgments." Moreover, in *Kuwait Oil Tanker Co. SAK v. Al Bader,* Justice Teare permitted post-judgment veil-piercing to treat a company's assets as those of the judgment debtor, but only because the court was "satisfied that the company was acquired by Mr. Al Bader for the purpose of ensuring that his assets would not be available to meet his *then existing (though not yet established)* liability to the Claimants for fraud." Commentators also regard the distinction between existing legal duty and potential future liability as fundamental to understanding English veil-piercing law.

*Id.* at 88-89 (citations omitted). *See also In re Optimal U.S. Litig.*, 2011 WL 4908745, at *3, 6-7

(holding that English law requires that the "defendant incur[] a liability to plaintiffs *before*

creating a fraudulent shell entity" and also that to "pierce the corporate veil a defendant must

have already incurred a liability and then set up a fraudulent shell entity to avoid that liability");

57

*FR 8 Singapore Pte. Ltd.*, 794 F.Supp.2d at 460 ("The distinction in this principle is one between a defendant using a corporate structure to evade rights of relief others already possess against him and a defendant who uses a corporate structure to evade rights of relief others may possess against him in the future.").[14]

## 2. Panama Law

Panama law "recognizes the creation of the corporate veil: that is, a business corporation organized according to the provisions of the Code of Commerce shall have its own juridical status and different from that of the shareholders for all of its acts and contracts." *Jonas*, 116 F.Supp.3d at 330-31 (internal quotations marks and citation omitted). Shareholders, directors, and officers are "not liable to pay with their personal assets for their rights and obligations acquired by the corporation, regardless of whether they acted on behalf of the corporation." *Panam Mgmt. Grp.*, 2011 WL 3423338, at *4 (internal quotations marks and citation omitted).

Panamanian legislation does not provide for mechanisms to pierce the corporate veil. However:

> [T]he Supreme Court of Justice of Panama has recognized that it may occur in "exceptional circumstances" and on a "provisional basis," where "corporations have been used with the sole intention of defrauding third parties or violating the law, thus resulting in a case of abuse of the legal capacity." "The criterion used by Panamanian courts to tear the corporate veil always has as common denominator the fact that the shareholders have not respected the legal entity, as well as the breach of the principle of separation of personalities, to reach those hidden behind it.

---

[14] The court in *In re Tyson* also discussed two other principles, neither of which is directly applicable here. First, "where the plaintiff may recover in fraud or 'deceit' against a defendant directly, that path is preferable to indirect liability via veil piercing." *In re Tyson*, 433 B.R. at 89. Thus, "where the [party has its] remedy in the form of an action for fraudulent misrepresentation, there is simply no need to lift the veil at all." *Id.* at 90 (internal quotation marks and citation omitted). Second, although not a veil-piercing principle *per se*, English courts have observed that parties may avoid the harsh effects of the *Salomon* principle by the "exercise of due diligence, for instance, by contracting around a potential problem." *Id.* "As such, assuming a plaintiff has acted prudently to protect itself, veil-piercing is unnecessary because the plaintiff may recover directly on a breach of guarantee against the defendant." *Id.*

58

*Jonas*, 116 F.Supp.3d at 331 (citations omitted); *see also Panam Mgmt. Grp.*, 2011 WL 3423338, at *5; *Cantley v. Ducharme*, No. 09-cv-23424, 2011 WL 611623, at *6 (S.D. Fla. Feb. 15, 2011).    According to the Supreme Court of Justice, "piercing of the corporate veil is an exceptional measure that is only admissible on a provisional basis for purposes of interim relief." *Panam Mgmt. Grp.*, 2011 WL 3423338, at *5 (internal quotations marks and citation omitted); *see also Jonas*, 116 F.Supp.3d at 331 (same).    In sum, the corporate veil may be pierced under Panamanian law where it is demonstrated that the shareholder(s) "controlled and used the corporation for the ***sole purpose of perpetrating fraud or violating the law***, thereby abusing the corporate form and hiding behind it to avoid liability." *Panam Mgmt. Grp.*, 2011 WL 3423338, at *5 (emphasis added); *see also Jonas*, 116 F.Supp.3d at 331 (same).    This is a "high bar" to meet and "naked, conclusory, and formulaic allegations" will not suffice. *Jonas*, 116 F.Supp.3d at 331.

Moreover, the Panamanian courts will only pierce the corporate veil to "reach shareholders—but not directors—who use the corporate form to commit illicit acts in Panama." *Id.* at 332.

### E.    The SAC's Alter Ego/Piercing the Corporate Veil Allegations are Inadequate

#### 1.    Allegations With Respect to Strand

The Trustee's alter ego/piercing the corporate veil allegations with respect to Strand are without merit for two separate, independent reasons.

First and foremost, it cannot be disputed that the Trustee's alter ego/piercing the corporate veil allegations do not meet English law's temporal requirement.    As already discussed above, "[t]he plaintiff's ability to recover from the defendant on a veil-piercing theory [under English law] turns on whether the defendant had already incurred some liability to the plaintiff at

the time he interposed the corporate structure." *In re Optimal U.S. Litig.*, 2011 WL 4908745, at
*7 (internal quotation marks and citation omitted). "In other words, [in order for the Trustee] to
pierce [Strand's] corporate veil[,] [Green] must have already incurred a liability [to BLMIS] and
then set up [Strand] to avoid that liability." *Id.*

Here, the SAC alleges that Green formed Strand on or about September 3, 1998. *See*
SAC ¶¶ 42, 44. However, it fails to allege that Green incurred any liability to BLMIS prior to
this date. The only initial transfer the Trustee seeks to recover from Green was allegedly made
on November 27, 2002. *See id.* Ex. D. As the SAC nowhere alleges that Green incurred liability
to BLMIS prior to setting up Strand or that he set up Strand for the purpose of avoiding any then-
existing liability to BLMIS (as opposed to potential future liability), the Trustee's alter
ego/piercing the corporate veil allegations must fail under English law. *See In re Optimal U.S.
Litig.*, 2011 WL 4908745, at *7 ("Multiadvisors was founded in 1995 and issued the allegedly
false and misleading statements—the acts, together with the losses resulting from Madoff's 2008
arrest, which incurred liability—between July 2001 and October 2008. Because OIS had not
incurred any liability to plaintiffs in 1995, and thus could not have created Multiadvisors to avoid
such liability, plaintiffs' corporate veil-piercing claim must fail under Bahamian law.");[15] *FR 8
Singapore Pte. Ltd.*, 794 F.Supp.2d at 461 (holding that the plaintiff failed to state a claim for
veil-piercing under English law where it did not allege that it had a right to relief against the
defendants at the time that the defendants set up the corporation for which it sought to pierce the
corporate veil); *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 453 F.Supp.2d 633,
683-84, 689 (S.D.N.Y. 2006) (refusing to pierce the corporate veil under English law where the
plaintiffs failed to present evidence that the corporate entity was created to shield the consortium

---

[15] Bahamian courts generally follow the decisions of English courts in the absence of contrary Bahamian authority.
*See In re Optimal U.S. Litig.*, 2011 WL 4908745, at *3.

60

members from existing liabilities/debts). *In re Tyson*, 433 B.R. at 94 (holding that the record did not permit piercing of the corporate veil where at the time the corporation was introduced into the transaction, certain defendants had not yet incurred any legal obligation to the debtor or other defendants).

Second, the Trustee's alter ego/piercing the corporate veil allegations are also devoid of merit under English law as the SAC fails to adequately allege that "special circumstances exist[ed] indicating that" Strand was a "mere façade concealing the true facts." *In re Tyson*, 433 B.R. at 87 (internal quotation marks and citation omitted). As discussed above, in order to meet this element of a veil-piercing claim under English law, the Trustee must allege an impropriety or dishonesty "linked to the use of [Strand's] structure to avoid or conceal liability." *Id.*

Here , all the SAC alleges, in classic conclusory fashion, is that "Green actively directed and controlled [Magnify's and Strand's] daily activities for his benefit and advantage, including dealings with Madoff and BLMIS," that the "entities acted in unison to allow [Green] the full ability to exert authority and control over their Accounts, for [his] personal benefit and for the purpose of profiting from Madoff's fraud," and "Green wrongly used Magnify, Strand and their collective assets as mere instrumentalities to further his own, and his family's, personal interests and to profit from BLMIS." SAC ¶¶ 113-14. Moreover, elsewhere, the SAC conclusorily alleges that Green "operated each of [Magnify, YHA, Premero, Strand, and Express] pursuant to a fraudulent scheme in order to, among other things, obtain money and benefits for himself, and his personal and business pursuits." SAC ¶ 36. Even taking these allegations as true (which Green vehemently denies), such allegations are insufficient to show an impropriety or dishonesty linked to the creation of Strand's corporate structure to avoid or conceal liability on the part of Green. *See FR 8 Singapore Pte. Ltd.*, 794 F.Supp.2d at 460-61 ("Even taking all of these

61

allegations as true, however, they plead at most that the [defendants] owned and controlled [the corporation] and that [the corporation] was set up to evade future possible liability arising from [the transactions at issue]. They do not plead that impropriety was linked to the corporate structure of [the company] under the second principle outlined above."); *Presbyterian Church of Sudan*, 453 F.Supp.2d at 683-84 (refusing to pierce the corporate veil where the plaintiffs failed to present evidence that the corporation conducted its business with the intent to defraud creditors). While elsewhere the SAC alleges in purely conclusory terms that Green participated in Madoff's fraud, (*see* SAC ¶¶ 9, 10, 105, 127), as with its other allegations, it fails to link these unfounded allegations of impropriety or wrongdoing to the use of Strand's corporate structure to avoid or conceal liability incurred by Green. As the court held in *In re Tyson*:

> Even if [Strand] was a "perfect set up" and "came in handy" for [Green], English law provides that a party is entitled to take advantage of the *Salomon* principle in order to limit its future liabilities, even where the corporate entity to be interposed is nothing more than a mere shell or fiction. To paraphrase *Adams*: "whether or not [Green's use of Strand was] desirable" as a matter of public policy, "the right to use a corporate structure in this manner is inherent in English corporate law."

433 B.R. at 94-95 (internal citations omitted).

### 2.    Allegations With Respect to Magnify

The Trustee's alter ego/piercing the corporate veil allegations concerning Magnify are also devoid of merit for two separate, independent reasons.

First, the Trustee's alter ego/piercing the corporate veil allegations fail as the SAC utterly fails to allege that Magnify was used for the *sole purpose of perpetrating a fraud or violating the law*. *See Panam Mgmt. Grp.*, 2011 WL 3423338, at *5. Rather, as discussed above, the SAC's alter ego/piercing the corporate veil allegations merely allege that "Green actively directed and controlled [Magnify's and Strand's] daily activities for his benefit and advantage, *including*

62

*dealings with Madoff and BLMIS*,"[16] that the "entities acted in unison to allow [Green] the full ability to exert authority and control over their Accounts, for [his] personal benefit and for the purpose of *profiting from Madoff's fraud*,"[17] and "Green wrongly used Magnify, Strand and their collective assets as mere instrumentalities to further his own, and his family's personal interests and to profit from BLMIS, which Green knew was a fraud." SAC ¶¶ 113-114 (emphasis added).[18] Nowhere in these conclusory and unsupported allegations does the Trustee allege that Green used Magnify for the sole purpose of perpetrating a fraud or violating the law.

Again, in several other places of the SAC, the Trustee conclusorily asserts that Green participated in Madoff's fraud. *See* SAC ¶¶ 9, 10, 105, 127. While Green strenuously denies these allegations, merely alleging that Green participated in Madoff's fraud is simply not the same thing as alleging that Green used Magnify for the *sole purpose of perpetrating that fraud*.

The closest the Trustee comes to alleging that Magnify was used for the sole purpose of perpetrating a fraud or violating the law is his allegation that "Green operated each of [Magnify, YHA, Premero, Strand, and Express] pursuant to a fraudulent scheme in order to, *among other things*, obtain money and benefits for himself, and his personal and business pursuits." SAC ¶ 36 (emphasis added). That allegation, even if true, would only establish that Magnify was used in part to perpetrate a fraud, as distinguished from being used for the *sole purpose of committing such a fraud*. However, this allegation, which Green strenuously denies, is conclusory to the

---

[16] By alleging that Green actively directed and controlled Magnify's and Strand's daily activities for his benefit and advantage, "*including dealings with Madoff and BLMIS*," the Trustee is admitting that Magnify was not used for the *sole purpose* of dealing with BLMIS, let alone perpetrating a fraud or violating the law regarding the same.

[17] Although Green strenuously denies he used Magnify for his own personal benefit and for the purpose of profiting from Madoff's fraud, even if he did, using Magnify to profit from someone else's fraud is not the same thing as using Magnify for the sole purpose of perpetrating a fraud.

[18] Green adamantly rejects these conclusory allegations, but in addition, as noted above, the vast majority of withdrawals from Magnify's BLMIS Accounts—some $126 million—were transferred to YHA for its philanthropic endeavors. *See supra* p. 2.

extreme and is insufficient under *Fed.R.Civ.P.* 9(b), which applies to alter ego/piercing the corporate veil allegations based on fraud, and would be insufficient even under the liberal pleading standards of Rule 8(a) if it applied. *See Care Envtl. Corp.*, 2006 WL 148913, at *13 n.13 ("However, I need not decide which standard applies in this case because plaintiff's conclusory allegations fail to meet even the more lenient 8(a) standard."). Nowhere in the SAC does the Trustee seek to explain in any manner Green's purported "fraudulent scheme" (as opposed to Madoff's fraudulent scheme). To the extent that the Trustee is claiming the fraudulent scheme is Green's use of Magnify (and Strand) to "obtain money and benefits for himself, and his personal and business pursuits," he fails to explain how such acts constitute a fraud or violate the law, and ignores the fact that the overwhelming majority of the withdrawals from Magnify's Accounts were transferred to YHA to fund YHA's charitable activities. And even if the Court were to find that these acts sufficiently allege a fraud or violation of the law, the Trustee has still failed to allege that Magnify was used for the *sole purpose* of carrying out these acts, and cannot do so given the charitable nature of YHA's distributions of most of the funds transferred from Magnify's Accounts to YHA's Account. As discussed above, the Trustee has admitted quite the opposite, i.e., that Magnify's dealings with Madoff and BLMIS were only part of its activities. *See supra* p. 62-63, n. 16.

Courts in similar circumstances have found alter ego/piercing the corporate veil allegations to be devoid of merit. *See Jonas*, 116 F.Supp.3d at 331 (refusing to find that several individual directors and officers of a corporation were its alter ego where the complaint contained no specific allegations, aside from "naked, conclusory, and formulaic allegations," that they abused the corporate form to perpetuate a fraud); *Panam Mgmt. Grp.*, 2011 WL 3423338, at *5 (holding alter ego/piercing the corporate veil allegations to be insufficient under Panama law

where the complaint did not make any allegations that the corporation was created for the sole purpose of perpetrating a fraud or otherwise violating the law or that the individual defendants abused the corporate form to perpetrate that fraud).

Second, as discussed above, Panama courts will only pierce the corporate veil to reach shareholders of a corporation. *See Jonas*, 116 F.Supp.3d at 332. The SAC alleges that in 1995, Green had Brunner "appoint him Magnify's Managing Director." SAC ¶ 38. However, nowhere in the SAC does it allege that Green was ever a shareholder of Magnify—and that is because he never was. *See* Green Aff. ¶ 23. Thus, because Panama courts will only pierce the corporate veil to reach shareholders and Green was never a shareholder of Magnify, he cannot be held liable for Magnify's personal debts and obligations, including the fraudulent transfers it allegedly received from BLMIS. *See Jonas*, 116 F.Supp.3d at 332 (holding that under Panama law, non-shareholder officers and directors cannot be held responsible for a company's actions based on a piercing the corporate veil theory).[19]

With respect to Counts One and Two of the SAC seeking to recover Two-Year Transfers from Initial Transferees, as Green was never the recipient of a Two-Year Transfer, the sole basis for holding him personally liable thereunder is as the alter ego of Magnify and/or Strand. As the Trustee's alter ego/piercing the corporate veil allegations fail as a matter of law, Counts One and Two of the SAC must be dismissed as against Green.

With respect to Counts Three, Four, Five, Six, and Seven of the SAC, they must be dismissed as against Green insofar as they are predicated upon alter ego/piercing the corporate

---

[19] While at least one court has stated that a corporation's corporate veil may be pierced under Panama law to hold a member of the board of directors liable for the company's debts, (*see Panam Mgmt. Grp.*, 2011 WL 3423338, at *5), the SAC does not allege that Green was a member of Magnify's board of directors during the time in which the relevant transactions took place and thus he cannot be held to be responsible for Magnify's liabilities during this time based on an alter ego liability theory. *See, e.g., Cardell Fin. Corp. v. Suchodolski Assocs., Inc.*, No. 09-cv-6148, 2012 WL 12932049, at *15 (S.D.N.Y. July 17, 2012) ("In determining whether an entity is the alter ego of another for liability purposes, the relevant time period is that of the transaction at issue.').

veil liability with respect to Magnify and Strand.

## POINT IV

### THE CONCLUSORY ALLEGATION OF A PARTNERSHIP BETWEEN ALBERT IGOIN AND YAIR GREEN HAS NO BASIS

In ¶ 2 of the SAC it is alleged, in completely conclusory fashion, that the "transfers in this case stem from a partnership between Albert Igoin . . . , a French banker who was one of Madoff's oldest and largest customers, and Israeli attorney Defendant Yair Green." That allegation, which goes no further, is made of whole cloth (like much of the SAC), and is patently false. The relationship between Igoin and Green was that of attorney and client, and nothing more. *See* Green Aff. ¶ 25. The Trustee's name-calling and efforts to besmirch Green's reputation cannot change the facts.

"[T]he party 'pleading the existence of a partnership has the burden of proving its existence.'" *N. Am. Knitting Mills, Inc. v. Int'l Women's Apparel, Inc.*, No. 99-cv-4643, 2000 WL 1290608, at *1 (S.D.N.Y. Sept. 12, 2000). In the SAC, the Trustee has failed to plead the elements of a partnership or, in the absence of an agreement, a *de facto* partnership. It is fundamental that "[a] partnership results from contract, express or implied." *Growblox Scis., Inc. v. GCM Admin. Servs., LLC*, No. 14-cv-2280, 2016 WL 1275050, at *7 (S.D.N.Y. Mar. 31, 2016) (internal quotation marks and citation omitted). In this case, there was no partnership agreement between Igoin and Green, and thus the Trustee does not, and cannot, plead one. The only other option available to the Trustee was to plead a *de facto* partnership. "Even in the absence of an explicit agreement, the existence of a partnership may be implied from the conduct, intention, and relationship between the parties." *Id.* (internal quotation marks and citation omitted). *See also Czernicki v. Lawniczak*, 74 A.D.3d 1121, 1124, 904 N.Y.S.2d 127, 131 (2d Dep't 2010) ("When there is no written partnership agreement between the parties, the

66

court must determine whether a partnership in fact existed from the conduct, intention, and relationship between the parties."); *VIDIVIXI, LLC v. Grattan*, 155 F.Supp.3d 476, 481 (S.D.N.Y. 2016) (same).

It is generally recognized that "[t]o demonstrate the existence of a partnership, a plaintiff must prove four elements: (1) the parties' sharing of profits and losses; (2) the parties' joint control and management of the business; (3) the contribution by each party of property, financial resources, effort, skill, or knowledge to the business; and (4) the parties' intention to be partners." *Kids Cloz, Inc. v. Officially For Kids, Inc.*, 320 F.Supp.2d 164, 171 (S.D.N.Y. 2004). *See also VIDIVIXI, LLC*, 155 F.Supp.3d at 481 (same); *Growblox*, 2016 WL 1275050, at *7 (same); *St.-Works Dev. LLC v. Richman*, No. 13-cv-774, 2015 WL 872457, at *4 (S.D.N.Y. Feb. 3, 2015) (same).

Several courts have broken down and expanded the essential elements of a *de facto* partnership to nine, reciting: "Factors to be considered in determining the existence of a partnership include (1) sharing of profits, (2) sharing of losses, (3) ownership of partnership assets, (4) joint management and control, (5) joint liability to creditors, (6) intention of the parties, (7) compensation, (8) contribution of capital, and (9) loans to the organization." *Czernicki*, 74 A.D.3d at 1124, 904 N.Y.S.2d at 131. *See also Brodsky v. Stadlen*, 138 A.D.2d 662, 663, 526 N.Y.S.2d 478, 479 (2d Dep't 1988).

Regardless of which of the elements or factors of a partnership are applied, it has been noted that: "'Although none of these factors is determinative, some of them weigh more heavily than others,' including the 'indispensable' quality of a partnership that the parties agree to share losses." *Growblox*, 2016 WL 1275050, at *7 (citation omitted).

As the SAC fails to plead any of the elements of a partnership, much less all of them, the

Trustee's conclusory allegation that Igoin and Green were partners has no basis in law or fact, and is completely devoid of merit.[20] Having failed to adequately allege the elements of a partnership or a *de facto* partnership, the Trustee cannot rely upon that naked allegation in an attempt to bolster any of his claims in the SAC. *See N. Am. Knitting Mills, Inc.*, 2000 WL 1290608, at *2 (failure to "plead facts that would establish the elements of a partnership" is a fatal defect).

## POINT V

### ALL TRANSFERS PRIOR TO JANUARY 1, 2001 MUST BE DISMISSED

Prior to January 1, 2001, Madoff operated his business as a sole proprietorship. As of January 1, 2001, Madoff converted his business operations to the BLMIS limited liability company. This Court has previously ruled that all Initial Transfers received prior to 2001 (the "Pre-2001 Transfers") cannot be avoided and recovered by the Trustee. *See Avellino*, 557 B.R. at 107-10, 126 (the "*Pre-2001 Transfers Decision*"); *Mendelow*, 560 B.R. at 227-28 (citing with approval the *Pre-2001 Transfers Decision*).

Based upon Exhibit B to the SAC, the *Pre-2001 Transfers Decision* mandates the dismissal of Count Seven of the SAC to the extent that it seeks to recover the Pre-2001 Transfers in the following BLMIS Accounts of the Accountholder Defendants:

    a.  In Magnify Account No. 1FN024, all Transfers from 7/11/1983 to 5/18/2000;

---

[20] Any contention by the Trustee that his allegation that at a meeting in Switzerland on December 14, 1989, Igoin introduced Green to Brunner as "the person that then would deal with the fate of Magnify," (SAC ¶ 56), serves to establish a partnership between Igoin and Green is without merit. That quotation comes from the transcript of Brunner's deposition, (*see* Ex. E at p. 93). Brunner's testimony in that regard establishes nothing more than Igoin's introduction of his Swiss attorney representing Magnify to his Israeli attorney representing Magnify. In addition, that isolated quotation, taken out of context, ignores Brunner's subsequent testimony and repeated references to Igoin's continued management of Magnify during his lifetime, and Igoin's supervision of Magnify and its BLMIS accounts during his lifetime. *See* Ex. E at pp. 91-93, 94-95, 116-25.

    b.  In Magnify Account No. 1FN025, all Transfers from 12/14/1990 to 6/6/1997;

    c.  In YHA Account No. 1FN037, all Transfers from 3/17/1989 to 12/21/2000;

    d.  In Premero Account No. 1FN073, all Transfers from 4/5/1995 to 6/17/1998;

    e.  In Premero Account No. 1FN097, all Transfers from 4/2/1998 to 4/5/1999 (where are all of the Transfers from this Account);

    f.  In Strand Account No. 1FR051, all Transfers from 4/5/1999 to 10/10/2000.

Count Seven of the SAC must also be dismissed as against Express with respect to the Initial Transfer to that Defendant on 6/4/1999, as set forth in Exhibit D to the SAC, as that Transfer was a Pre-2001 Transfer.

## POINT VI

### THE TRUSTEE'S EQUITABLE SUBORDINATION CLAIM IS DEFICIENT AND MUST BE DISMISSED

Count 9 of the SAC seeks the equitable subordination of the claims filed by the Accountholder Defendants. Although it will not be determined whether the Accountholder Defendants are "net winners" or "net losers" based upon the "cash in/cash out" analysis until the time of trial, the Trustee's equitable subordination Count must be dismissed at this juncture.

It was established in *Katz* that the Trustee may subordinate claims by "proving that the defendants invested with Madoff Securities with knowledge, or in reckless disregard, of its fraud." 462 B.R. at 456. *See also Merkin II,* 563 B.R. at 755 (same); *Merkin,* 515 B.R. at 158 ("The [defendants] are not insiders of BLMIS, and 'although equitable subordination can apply to an ordinary creditor, the circumstances are few and far between.' . . . Thus, the proponent must plead and prove that the non-insider engaged in 'gross and egregious' conduct 'tantamount to fraud, misrepresentation, overreaching or spoliation.'") (internal quotation marks and citations

69

omitted).

In other words, an equitable subordination claim will only survive a motion to dismiss if the complaint sufficiently alleges "that the [defendants] did not receive the initial transfers in good faith," (*Kingate*, 2015 WL 4734749 at *17), to wit, "that the claimants received their transfers with actual knowledge of Madoff's fictitious trading scheme and in bad faith," (*Avellino*, 557 B.R. at 127).

As it has been established that the SAC fails to adequately allege "actual knowledge," "bad faith," or "willful blindness" (i.e., reckless disregard) of the BLMIS Ponzi scheme, (*see supra* Points I, II), Count 9 of the SAC must be dismissed.

## CONCLUSION

The relief requested in Defendants' motion to dismiss Plaintiff's SAC should be granted in all respects.

Dated: New York, New York
       October 30, 2017

DAVIDOFF HUTCHER & CITRON LLP

By: _____
       Michael Wexelbaum
605 Third Avenue, 34th Floor
New York, New York 10158
Telephone: (212) 557-7200
Facsimile: (212) 286-1884
Michael Wexelbaum
E-Mail: mw@dhclegal.com
Larry Hutcher
E-mail: lkh@dhclegal.com
Michael Katz
E-mail: mdk@dhclegal.com

*Attorneys for Defendants*
*Magnify Inc., Premero Investments Ltd.,*
*Strand International Investments Ltd.,*
*The Yeshaya Horowitz Association, Yair*
*Green, and Express Enterprises Inc.*

70